UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| RONNIE LEE BOWLING, | ) | |
| | ) | |
| Petitioner, | ) | Civil No. 03-28-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| PHILIP W. PARKER, Warden, | ) | **OPINION & ORDER** |
| | ) | |
| Respondent. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

Nearly twenty years ago, a Kentucky jury convicted Petitioner Ronnie Lee Bowling of murdering Ronald Smith and Marvin Hensley and sentenced him to death. Bowling has filed a petition for the writ of habeas corpus, R. 1, alleging numerous errors in his trial and appeal. As the Court explained in its previous Order, R. 192, many of Bowling's claims are intertwined with his motions for an evidentiary hearing, R. 118, additional discovery, R. 120, and funds for a brain MRI and neuropsychological evaluation, R. 166. This Memorandum Opinion and Order addresses thirty-seven of Bowling's claims that are not related to those evidentiary motions. On all thirty-seven, Bowling is not entitled to habeas relief.

# TABLE OF CONTENTS

**BACKGROUND** .................................................................................. 4

**DISCUSSION** ................................................................................... 10

  **I.**    **Denial of Motion for a Change of Venue (Claim 1)** ................................ 10

  **II.**   **Proportionality Review (Claims 6, 36, 39)** ...................................... 16
      *A. Challenge to Kentucky's Proportionality Review (Claims 6 and 36)* ............... 16
      *B. Access to Death Penalty Data (Claim 39)* ................................... 21

  **III.**  **Confidential and Independent Defense Expert (Claim 8)** ....................... 23

  **IV.**  **Guilt Phase Instructions (Claims 9A, 9B, 9D)** ............................... 30
      *A. Failure To Instruct on Theft (Claim 9A)* .................................. 30
      *B. Failure To Instruct on First-Degree Manslaughter (Claim 9B)* ............... 32
      *C. Instructions on Presumption of Innocence (Claim 9D)* ....................... 33

  **V.**   **Penalty Phase Instructions (Claims 11, 12, 27, 35)** .......................... 35
      *A. Penalty Phase Verdict Forms (Claim 11)* ................................... 35
      *B. Instructions on Unanimity for Mitigating Circumstances (Claim 12)* ............ 37
      *C. Aggravating Circumstance for Multiple Murders (Claim 27)* .................... 39
      *D. Penalty Phase Instructions (Claim 35)* .................................... 42
         1. Jury Instructions on Mitigating Factors (Claim 35A) ...................... 42
         2. Directed Verdict on Mitigating Factors (Claim 35B) ...................... 44
         3. "Life Option" Instruction (Claim 35D) .................................. 44
         4. Adverse Inference Instruction (Claim 35F) ............................... 45
         5. Mitigation Limited to Penalty Phase Evidence (Claim 35H) ................. 49

  **VI.**  **Speedy Trial Right and Denial of Continuances (Claims 14, 28, 31)** ........... 49
      *A. Speedy Trial Right (Claim 14)* ............................................ 49
      *B. Denial of Motions To Continue Trial (Claim 28)* ........................... 59
      *C. Denial of Motion To Continue Sentencing Hearing (Claim 31)* ................. 62

  **VII.** **Testimony of Ora Lee Isaacs (Claims 17, 30)** ............................... 64
      *A. Release of Psychological Records (Claim 17)* .............................. 64
      *B. Isaacs's Testimony (Claim 30)* ........................................... 65

  **VIII.** **Burglary and Robbery Charges (Claims 5, 10, 25, 29)** ...................... 68
      *A. Directed Verdict on Burglary Charges (Claim 5)* ........................... 68
      *B. Directed Verdict on Aggravating Circumstances (Claim 10)* .................. 72
      *C. Directed Verdict on Robbery Charges (Claim 25)* ........................... 73
      *D. Multiple Punishments (Claim 29)* ......................................... 74

**IX. Evidentiary Objections (Claims 21, 22, 23)** ............................................. 76
    *A. Rebuttal Evidence (Claim 21)* ................................................................. 76
    *B. Character Evidence (Claim 22)* ............................................................... 77
    *C. Hearsay Testimony and Other Evidentiary Rulings (Claim 23)* ........................... 79

**X. Prosecutorial Misconduct (Claims 24, 32, 34)** ................................... 80
    *A. Guilt Phase Closing Argument (Claim 24)* ............................................... 80
    *B. Penalty Phase (Claims 32 and 34)* ........................................................ 83

**XI. Ineffective Assistance of Counsel (Claims 49, 65)** .......................... 87
    *A. Failure To Investigate and Prepare Edward Eugene Herren (Claim 49)* ........... 87
    *B. Failure To Object to Evidence of Rockcastle County Shooting (Claim 65)* .......... 90

**XII. Ex Parte Hearing on Expert Funding (Claim 56)** ............................... 92

**XIII. Trial Judge Bias (Claim 68)** ........................................................ 95

**XIV. Comparative Bullet Lead Analysis Evidence (1st Amend. to Petition)** ........... 101

**XV. Cumulative Error (Claim 44)** ...................................................... 109

**CONCLUSION** ................................................................................. 110

## BACKGROUND

On January 20, 1989, Ronald Smith worked his usual midnight to 8 a.m. shift at the Jones Chevron station in London, Kentucky.  Smith had $200 in the cash register when he started his shift, and he usually worked alone until 6:30 a.m.  Around 5:30 a.m., two customers noticed that the gas pumps were not working.  They went inside and found Smith lying face-down on the floor—dead.  The cash register reflected $354 in sales over the course of the night, with a "no sale" indicated at 5:21 a.m, but the register was empty except for coins.  Smith had been shot six times: three times in the back of the head, twice in the back, and once in the chest.

A month later, on February 22, 1989, Marvin Hensley opened his gas station one-and-a-half miles north of London around 6:00 a.m.  One customer bought five dollars of gas from him at 6:15 a.m.  But when another customer entered the station at 7:00 a.m., he found Hensley dead on the floor.  Hensley, who was also a minister at a church in Mt. Vernon, had suffered three gunshot wounds to the back of his head, one to his ear, one to the back of his neck, and one to his hand.  Again, the station's cash register was empty except for coins.

The Smith and Hensley murders received extensive attention in the local news, and gas station operators began to take additional security precautions.  One such operator was Ricky Smith (no relation to Ronald), who owned and operated a Sunoco station on U.S. Highway 25 in Rockcastle County, Kentucky.  On February 25, 1989, Smith opened his station around 6:00 a.m.  Not long afterward, Ronnie Lee Bowling entered the station. Bowling told Smith he was looking for a job, but kept his hands in his pockets and asked Smith if the station ever had two employees on duty at the same time.  Smith also recalled that Bowling looked out the station window, up and down the highway in both directions.

4

Smith told Bowling that the station was not hiring, and Bowling began to leave.  But as Bowling exited, he pulled out a revolver and started firing at Smith.  Reacting quickly, Smith dove behind a wall and metal desk and pulled out his own gun.  When he heard Bowling finish shooting, Smith returned fire at Bowling through the wall.  When Smith fired back, Bowling ran out of the station, jumped in to his car, and headed south on Highway 25.

Smith called the Kentucky State Police, told them what happened, and gave them a description of Bowling.  State Police Troopers Allen Lewis and Danny Alton quickly intercepted Bowling's car and began pursuing it.  When Lewis switched on his blue lights, Bowling responded by accelerating.  The pursuit continued for more than thirty miles, and, according to Lewis, frequently exceeded speeds of 100 miles per hour.  By the time Bowling stopped at an area near his residence, eight to ten other police cars were involved in the chase.  The police arrested Bowling and noticed that he was bleeding from his head.

During the chase, police observed Bowling throw two brown objects out of his car near the nine-mile marker of Kentucky Highway 472.  When police returned to this location, they found a pair of brown gloves.  State police troopers searching the entire route of the chase made an even more important discovery—near the area where the chase began, they found a .38-caliber revolver.  Ricky Smith identified the gun as similar to the one Bowling brandished at the Sunoco station.

When the police arrested Bowling, he told them that he entered Ricky Smith's gas station to look for a job.  According to Bowling, Smith lost his temper during the conversation and began shooting.  Bowling claimed that he never had a gun at the gas station, and that he did not throw anything out of his car while fleeing from the police.

5

Bowling also denied ever owning a handgun.  When Bowling gave his initial statement to the police, he was bleeding because one of Smith's shots had grazed the side of his head.

Bowling's trial lasted from September 21 to October 9, 1992.  At the trial, a Kentucky State Police forensic scientist presented evidence of tests that analyzed the lands and grooves of the .38-caliber revolver that police found on the side of the road and the bullets found at the crime scenes.  These tests revealed that one of the bullets that killed Ronald Smith and four of the bullets that killed Marvin Hensley matched the handgun found on the side of the road.  Bullets found at the third crime scene, Ricky Smith's Sunoco station, were too badly warped for the forensic scientist to conclusively tie them to the .38-caliber revolver.  The bullets were, however, the type that a .38-caliber revolver could have fired.

The Kentucky State Police also sent the bullets to the FBI for additional testing.  Donald Havekost, an FBI forensic scientist, conducted a comparative metallurgical analysis of the lead in the bullets through a process known as comparative bullet lead analysis (CBLA).  From this analysis, he linked bullets that killed Hensley and Smith and bullets from Ricky Smith's Sunoco station with each other and with bullets found in an ammunition box at Bowling's home.

A federal prisoner named Timothy Chappell also testified at Bowling's trial. Chappell was detained in the Laurel County Jail at the same time as Bowling, and he testified that Bowling confessed the two murders to him.  According to Chappell, Bowling said he was sorry about shooting Hensley because he did not know that Hensley was a preacher. Bowling also said he had killed both men because a service station attendant had once made a pass at his wife and all service station attendants were the same.

6

Another witness at Bowling's trial was his ex-wife, Ora Lee Isaacs. Isaacs was married to Bowling at the time of the crimes, but the two divorced before trial. She identified Bowling as the owner of the gun found by the side of the road and testified that Bowling left their mobile home in the early morning hours of the days Smith and Hensley were murdered.

To rebut this testimony, Bowling called various members of his family as witnesses. Bowling's father, Ledford, testified that he owned both a .38-caliber handgun and the ammunition that the police found in Bowling's mobile home. Bowling's aunt and uncle testified that Bowling was with them in Indiana on the day of Ronald Smith's murder. And according to Bowling's younger sister and one of her friends, Bowling's car was parked in front of his trailer with frost on the windshield around 7:15 a.m. on the morning of the Hensley murder.

Bowling also called April Lunsford as a witness. Lunsford testified that she spent the night before the Hensley murder, with Bowling at the Kozy Motel, and that Bowling left her the next morning around 7:00 a.m. She produced a registration card from the motel for that evening. The card had been filled out by Bowling's cousin, who worked at the motel.

After deliberating for one day, the jury found Bowling guilty of murder, first-degree burglary, and first-degree robbery for both the Smith and Hensley killings. After hearing additional evidence in a penalty phase, the jury returned a sentence of death for each of the murders and gave Bowling a twenty-year sentence for each burglary and robbery conviction. The trial judge formally sentenced Bowling and entered judgment on December 4, 1992. Bowling then filed a direct appeal of his conviction, which the Kentucky Supreme Court rejected on the merits on June 19, 1997. *Bowling v. Commonwealth*, 942 S.W.2d 293 (Ky.

1997).  The U.S. Supreme Court declined to hear his appeal a few months later.  522 U.S. 986 (1997).

In 1998, Bowling filed a collateral attack on his conviction under Kentucky Rule of Criminal Procedure 11.42 in Laurel Circuit Court, alleging, among other things, ineffective assistance of counsel.  The Laurel Circuit Court denied his claims, and the Kentucky Supreme Court affirmed that judgment.  *Bowling v. Commonwealth*, 80 S.W.3d 405 (Ky. 2002).  Bowling also filed a motion for a new trial in Laurel Circuit Court, primarily alleging juror misconduct.  Again, the Laurel Circuit Court denied that motion, and again, the Kentucky Supreme Court affirmed.  *Bowling v. Commonwealth*, 168 S.W.3d 2 (Ky. 2006). And in 2005, Bowling filed another motion for a new trial, challenging the testimony of Donald Havekost.  The Laurel Circuit Court denied that motion, and the Kentucky Supreme Court affirmed.  *Bowling v. Commonwealth*, No. 2006-SC-000034-MR, 2008 WL 4291670 (Ky. Sept. 18, 2008).

Bowling also sought collateral review in the federal courts.  He filed a habeas petition alleging sixty-eight grounds for relief on January 15, 2003. R. 1.   In 2007, he amended that petition with three additional claims.  R. 81.  The district court initially dismissed the petition on exhaustion grounds, and Bowling appealed that ruling.  R. 12; R. 17; R. 18.  The Sixth Circuit reversed and remanded, holding that Bowling had exhausted his state-court remedies. *Bowling v. Haeberline*, 246 F. App'x 303, 307 (6th Cir. 2007).  After the case was transferred to the undersigned, the Court ordered supplemental briefing.  R. 190.  Bowling's petition is now ripe for decision on the merits.

Because Bowling filed his habeas petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d), applies to his claims.  That statute allows

8

this Court to grant Bowling relief only if the Kentucky Supreme Court violated clearly established federal law or made an unreasonable determination of the facts. Bowling filed a motion to declare § 2254(d) unconstitutional, R. 155, which the Court denied, R. 211.

## DISCUSSION

**I.      Denial of Motion for a Change of Venue (Claim 1)**

Bowling's first claim is that the trial court violated his right to due process by denying his motion for a change of venue in light of pretrial publicity about his case. Bowling's arrest and trial were certainly big news in Laurel County, Kentucky—nearly eighty-five percent of the potential jurors questioned in voir dire said they had heard about the case. *Bowling*, 942 S.W.2d at 298. Bowling raised this claim in his state court proceedings. But the Kentucky Supreme Court found that "although almost every potential juror had heard or read something about the initial disappearance of the victims or arrest of the defendant, most did not remember details and had not prejudged the case." *Id.* As a result, that court held that the pretrial publicity did not prejudice Bowling and that the trial court did not abuse its discretion when it denied his motion to change venue. *Id.* at 298-99.

As a threshold matter, the parties disagree over whether the 28 U.S.C. § 2254(d) standard of review should apply. Bowling argues that Claim 1 is really two claims: that the trial court should have granted his motion based on a presumption that pretrial publicity prevented him from receiving a fair trial and that his jury was actually contaminated by prejudice. R. 210 at 5-6. Starting from that premise, he claims that § 2254(d) should not apply to his presumed prejudice claim because the Kentucky Supreme Court's decision addressed only actual prejudice and was "silent" on presumed prejudice. R. 159 at 50.

This argument misstates when § 2254(d) applies. The Supreme Court has recently made it clear that § 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been adjudicated on the merits." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (internal quotation marks omitted). A state court adjudicates a claim on the

merits even when it neglects to reveal "which of the elements of a multipart claim it found insufficient." *Id.* at 784.  As a result, § 2254(d) applies "when a 'claim,' not a component of one, has been adjudicated." *Id.*[1]  Bowling has presented one "claim" for relief—that the trial court violated his due-process rights when it denied his motion for a change of venue.  This claim had two components: presumed and actual prejudice.  Bowling himself conflated the two into one claim in his brief to the Kentucky Supreme Court.  *See* Appellant's Br., No. 92-SC-1035, App'x of App. Rec. 968-72.  Although the Kentucky Supreme Court did not explicitly address one of the two components, there is no question that it adjudicated Bowling's entire claim.  In an ideal world, the Kentucky Supreme Court would have addressed both components of Claim 1, but "[o]pinion-writing practices in state courts are influenced by considerations other than avoiding collateral attack in federal court." *Harrington*, 131 S. Ct. at 784; *see also Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997) (pointing out that requiring state courts to explain all of their reasons for denying a claim "would place the federal court in just the kind of tutelary relation to the state courts that [§ 2254(d) was] designed to end").  Section 2254(d) applies to both halves of Bowling's first claim.

---

[1] In the context of ineffective assistance of counsel claims, the Sixth Circuit has suggested that when a state court addresses one prong of the *Strickland v. Washington*, 466 U.S. 668 (1984), test, but not the other, § 2254(d) does not apply to the unaddressed prong. *See, e.g.*, *Higgins v. Renico*, 470 F.3d 624, 631 (6th Cir. 2006) ("Because the state court did not address the performance prong of the *Strickland* test, this court considers *de novo* whether counsel's performance was seriously deficient.").  This analysis predates the Supreme Court's decision in *Harrington*, which explicitly held that § 2254(d) applies "when a 'claim,' not a component of one, has been adjudicated."  131 S. Ct. at 784.  Even prior to *Harrington*, the Sixth Circuit did not extend its reasoning beyond ineffective-assistance claims.

Even under the § 2254(d) standard, Bowling argues that the Kentucky Supreme Court's decision was contrary to clearly established federal law.  In Bowling's view, the Kentucky Supreme Court "misstated or misunderstood the rule established by the governing precedent" by omitting any discussion of presumed prejudice.  R. 210 at 11.  Bowling is correct insofar as the Kentucky Supreme Court did not use the magic words "presumed prejudice" in its decision.  But the Kentucky Supreme Court's decision did not run afoul of the then-controlling federal constitutional standard, *Murphy v. Florida*, 421 U.S. 794 (1975). *Murphy* held that a court should presume prejudice only when its proceedings are "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob."  *Id*. at 799. Presumed prejudice results from a "circus atmosphere" where "a courthouse [is] given over to the public appetite for carnival."  *Id*.; *see also Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007) (noting that "[p]rejudice from pretrial publicity is rarely presumed").

Bowling has pointed to nothing in the record suggesting a circus-like atmosphere or frenzy at the Laurel County courthouse.  Rather, he believes that the Kentucky Supreme Court should have presumed prejudice because the case was "highly publicized in the London *Sentinel-Echo* and the Corbin *Times-Tribune*," vending machines in the courthouse contained newspapers with a story about jury selection, and the trial court had to direct the press to sit in a designated area.  R. 159 at 47-48.  None of these facts indicate mob justice. In fact, the trial court appears to have kept jury selection on a tight leash by ordering the press not to film or take pictures and not to talk to prospective jurors.  Order of Sept. 23,

1992, 5 T.R. 606.[2]   There is no indication in the record that Bowling's trial was "utterly corrupted" by press coverage.  *Murphy*, 421 U.S. at 798.

The trial court also held a hearing on the motion to change venue, at which six witnesses testified that Bowling could receive a fair trial in Laurel County.  *Bowling*, 942 S.W.2d at 298.  And unlike cases where trial swiftly followed a widely reported crime, *see, e.g.*, *Rideau v. Louisiana*, 373 U.S. 723, 724 (1963), more than three years passed between Bowling's arrest and trial.  Media coverage of the accusations against Bowling diminished during the interim, and jurors' memories began to fade.  *See, e.g.*, Voir Dire of Robert Fiechter, 8 T.E. 1074[3] ("I heard this was Mr. Bowling and a service station attendant, somewhere in Mount Vernon, I don't know where, it's been too long."); Voir Dire of Pauline Caldwell, 9 T.E. 1299 (saying she remembered "nothing really" about the case because "it's been so far back"); Voir Dire of James Gilbert, 11 T.E. 1537-38 (explaining that he heard about the case "a long time ago"); *cf. Skilling v. United States*, 130 S. Ct. 2896, 2916 (2010) (noting that "the decibel level of media attention diminished somewhat" in the four years between Enron's bankruptcy and the defendant's trial).  The Kentucky Supreme Court may not have framed its decision in the language of *Murphy*, but it did not act contrary to clearly established federal law when it refused to presume that Bowling was prejudiced.

The Kentucky Supreme Court also did not act contrary to clearly established federal law when it found that Bowling suffered no actual prejudice.  A defendant suffers actual prejudice only if prospective jurors cannot base their verdict solely on the evidence presented

---

[2] Throughout this Opinion, the Court abbreviates the trial record on direct appeal as "T.R."
[3] Throughout this Opinion, the Court abbreviates the Transcript of Evidence as "T.E."

in court. *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). The Supreme Court has further explained that the relevant question is whether a juror swore that he could "set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. 1025, 1036 (1984).

In Bowling's case, the trial court found (and the Kentucky Supreme Court affirmed) that the seated jury was fair and impartial, and that "no unqualified juror participated in the decision of the case." *Bowling*, 942 S.W.2d at 298. That decision was supported by the facts and conformed with clearly established federal law. In *Murphy*, for instance, twenty of the seventy-eight persons questioned during voir dire were excused because they held an opinion about the defendant's guilt. 421 U.S. at 803. That proportion was not sufficient to impeach the impartiality of the remaining jurors who did not express an opinion. *Id.*; *see also Mu'Min v. Virginia*, 500 U.S. 415, 417 (1991) (holding that a defendant's due-process rights were not violated when eight of twelve impaneled jurors were aware of news reports about the defendant, but all of the impaneled jurors said they could be impartial). By contrast, only eight of the seventy-four prospective jurors in this case indicated that they had formed an opinion about Bowling's guilt, and only four of those eight said that they presumed Bowling was guilty. *Bowling*, 942 S.W.2d at 298.

Moreover, the trial court took extraordinary steps to ensure that the jury was impartial. Voir dire took five days as the trial court individually questioned each potential juror for bias. The transcript record of this questioning covers nearly two thousand pages. *See* 4 T.E. 528 to 17 T.E. 2519; *cf. Skilling* 130 S. Ct. at 2918-21 (holding that five hours of voir dire was sufficient to seat an impartial jury). In group voir dire, the trial court judge admonished all prospective jurors not to read any press coverage. *See* 5 T.E. 646; *id.* at 699-

701.  And in individual voir dire, the trial court asked detailed questions about prospective jurors' knowledge of the case.

Take, for example, prospective juror Tom Smith.  Bowling claims that Smith's voir dire answers reflect the "pervasiveness" of pretrial publicity and that his knowledge of the case "would lead a reasonable juror to believe a defendant was guilty prior to actually hearing the evidence."  R. 159 at 48-49.  As a first matter, Smith did not actually serve on the jury—Bowling used one of his peremptory strikes to remove him.  R. 1 at 60.  But a review of Smith's voir dire testimony shows both the thoroughness of the trial court and Smith's own impartiality.  Although Smith had read an article about the case "a long time ago," 12 T.E. 1790, he said he had not formed any opinions about Bowling, *id*. at 1792.  He also said that he understood that jurors could not consider any information they heard outside of trial, *id.* at 1801-02, that he could presume Bowling was innocent, *id*. at 1809, and that if the prosecution failed to present evidence beyond a reasonable doubt, he would find Bowling not guilty, *id*. at 1810-11.  These answers do not show actual prejudice to Bowling, and the Court must presume that jurors are honest during jury selection when they answer questions under oath.  *See United States v. Rosario*, 111 F.3d 293, 300 (2d Cir. 1997) (("[A]bsent evidence to the contrary, we presume that jurors remain true to their oath . . . .") (quoting *United States v. Easter*, 981 F.2d 1549, 1553 (10th Cir. 1992))).

This Court also cannot fault the Kentucky Supreme Court for deferring to the trial court's determination that Bowling could receive a fair trial in Laurel County.  Every homicide case in a small community will receive publicity, and trial courts have the best vantage point to gauge that publicity's effect.  *See Skilling*, 130 S. Ct. at 2918 ("Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's

impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty.").   The Kentucky Supreme Court thus did not act contrary to clearly established federal law when it held that pretrial publicity did not require a change of venue because of actual prejudice.   Bowling is not entitled to relief on Claim 1.

## II.   Proportionality Review (Claims 6, 36, 39)

### A.   Challenge to Kentucky's Proportionality Review (Claims 6 and 36)

On direct appeal, the Kentucky Supreme Court held that Bowling's death sentence was "not disproportionate to the penalty imposed in similar sentences since 1970, considering both the crime and the defendant."   *Bowling*, 942 S.W.2d at 306.   That ruling was not contrary to or an unreasonable application of clearly established federal law, so Bowling's claims fail.

The Eighth Amendment requires a death sentence to be proportionate to the crime the defendant committed.   *See, e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) ("[W]hen a life has been taken deliberately by the offender, we cannot say that [death] is invariably disproportionate to the crime.") (footnote omitted); *Coker v. Georgia*, 433 U.S. 584, 592 (1977) (holding that death was a disproportionate punishment for the crime of adult rape). But state courts need not engage in "comparative" proportionality review.   That is, they are not required to determine whether the defendant's sentence was proportionate to the sentences of other defendants who came from similar backgrounds and committed similar crimes.   *See Pulley v. Harris*, 465 U.S. 37, 50 (1984); *see also McCleskey v. Kemp*, 481 U.S. 279, 306-07 (1987) (holding that a defendant "cannot prove a constitutional violation by

demonstrating that other defendants who may be similarly situated did *not* receive the death penalty").

Kentucky has nevertheless chosen to exceed the federal constitutional minimum. Kentucky Revised Statute § 532.075 requires the Kentucky Supreme Court to conduct a comparative proportionality review.  Bowling first argues that the Kentucky Supreme Court's comparative review was arbitrary and capricious in violation of the Eighth Amendment.  R. 1 at 88-89.  Under Kentucky's statutory scheme, the Kentucky Supreme Court must consider "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  Ky. Rev. Stat. § 532.075(3)(c).  The court must also "include in its decision a reference to those similar cases which it took into consideration."  *Id.* § 532.075(5).  This statutory language is identical to Georgia's appellate review procedures, which, according to the United States Supreme Court, serve "as a check against the random or arbitrary imposition of the death penalty."  *Gregg*, 428 U.S. at 206; *see also Ice v. Commonwealth*, 667 S.W.2d 671, 679 (Ky. 1984) ("The Kentucky [death penalty] statute is modeled after the Georgia statute, which has been declared constitutional in [*Gregg*].").  As a result, Kentucky's comparative review was neither arbitrary nor capricious, and Bowling did not suffer a violation of his Eighth Amendment rights.  *See also Getsy v. Mitchell*, 495 F.3d 295, 306 (6th Cir. 2007) (en banc) (holding that Ohio's comparative proportionality review procedures were not arbitrary or capricious and noting that the state "adds an additional safeguard beyond the requirements of the Eighth Amendment").

Bowling also argues that the Kentucky Supreme Court's proportionality review violated his right to due process.  R. 159 at 122.  Specifically, he argues that the court

improperly excluded cases in which the defendant received a sentence less than death, R. 159 at 133, and improperly included cases in which the defendant received the death penalty but was not executed.  R. 159 at 134.

Bowling's first due-process argument does not square with Sixth Circuit precedent. In the case of Thomas Clyde Bowling, the Sixth Circuit suggested that Kentucky's proportionality law did not give death penalty defendants a due-process right.  *Bowling v. Parker*, 344 F.3d 487, 521-22 (6th Cir. 2003).  A statute does not create a due-process interest when it "only tells the supreme court what questions it must ask" but "does not tell the supreme court *how* it must do so" nor "define[s] the terms (*e.g.,* arbitrariness) of these questions."  *Id.* at 521 (quoting *Coe v. Bell*, 161 F.3d 320, 352 (6th Cir. 1998)).  If Kentucky law did not "put specific limits on official discretion," Bowling could not have had a federal due-process right for the Kentucky Supreme Court to violate.  *Coe*, 161 F.3d at 352; *see also Bowling*, 344 F.3d at 522 (explaining that the mechanics of the Kentucky statute suggest "under *Coe* that no due-process right exists").

But even if Kentucky law did create a due-process right, the Sixth Circuit held that clearly established federal law in 1993 did not require the Kentucky Supreme Court to consider cases in which the defendant did not receive the death penalty.  *Bowling*, 344 F.3d at 522.  Kentucky's failure to include the additional cases was, at most, "an ineffective framework for assessing proportionality." *Id*.  As long as Kentucky did not "misappl[y] its own framework," death row inmates did not suffer a due-process violation.  *Id*.; *see also Buell v. Mitchell*, 274 F.3d 337, 369 (6th Cir. 2001) (upholding Ohio's limits on the cases that a reviewing court can consider because "proportionality review is not required by the Constitution," and, as a result, "states have great latitude in defining the pool of cases used

for comparison").  In this case, Ronnie Lee Bowling has raised precisely the same argument as Thomas Clyde Bowling: that Kentucky's proportionality review is constitutionally flawed because it does not include cases where defendants did not receive the death penalty.  The Sixth Circuit's decisions foreclose this argument, so Bowling cannot prevail on these grounds.

Bowling next argues that the Kentucky Supreme Court improperly included defendants who were sentenced to death but never executed.  States, however, have "wide latitude" to decide which cases to include and which to exclude from their comparative proportionality reviews.  *Buell*, 274 F.3d at 369.  Bowling points out that fourteen of the thirty-two cases the Kentucky Supreme Court considered in his case were decided under a previous statutory regime that was invalidated by the United States Supreme Court in *Furman v. Georgia*, 408 U.S. 238 (1972).  R. 159 at 134.  Another six cases involved defendants who later received clemency or had their death sentences vacated on other constitutional grounds.  *Id.*  Yet the Kentucky Supreme Court did not err by including these cases as part of its proportionality review.  The relevant statute requires that court to consider "all felony offenses in which the death penalty was *imposed* after January 1, 1970," Ky. Rev. Stat. § 532.075(6)(a) (emphasis added), not all cases in which the defendant was *executed*.  In all of the cases Bowling identifies, a death sentence was imposed but not carried out.  These are precisely the cases the Kentucky Supreme Court should have and did compare to Bowling's case.  *Accord Gall v. Commonwealth*, 607 S.W.2d 97, 113 (Ky. 1980) (explicitly considering cases in which the defendant's death sentence was vacated on the basis of *Furman*).  Even if those *pre-Furman* death sentences were disproportionate, the Kentucky Supreme Court could have considered them as evidence of what sentences previous courts

imposed when faced with similar circumstances. *Cf. Ross v. State*, 211 S.E.2d 356, 360 (Ga. 1974) (rejecting a similar challenge to Georgia's identical proportionality review on the grounds that "[i]t is the reaction of the sentencer to the evidence before it which concerns this court and which defines the limits which sentencers in past cases have tolerated, whether before or after *Furman v. Georgia*."). Indeed, the Kentucky Supreme Court would have deviated from the Commonwealth's statutory regime if it had failed to include these cases. The proportionality review in Bowling's case did not violate any of his constitutional rights.

In Claim 36, Bowling argues that his death sentence violated the Eighth Amendment, but he adds one new wrinkle to the debate. *See* R. 1 at 184-85; R. 159 at 186-87. When the Kentucky Supreme Court considered whether Bowling's sentence was proportional, it followed the state's statutory review scheme. *See Bowling*, 942 S.W.2d at 306. That statute required the Kentucky Supreme Court to determine whether a death sentence would be "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Ky. Rev. Stat. § 532.075(3)(c).

Bowling does not contest that the Kentucky Supreme Court's review complied with state law; rather, this claim rehashes his argument that the statutory scheme was unconstitutional. *See, e.g.*, R. 159 at 186 ("Kentucky's proportionality review does not comply with federal constitutional requirements."). As the Court already explained, *see supra* p. 16, Kentucky's statutory review does not violate the Eighth Amendment.

Bowling also argues that the Kentucky Supreme Court's decision was contrary to clearly established federal law because it failed to consider any mitigating factors. R. 159 at 186. But federal law requires the sentencing jury, not an appeals court, to consider mitigating factors. *See, e.g.*, *Smith v. Texas*, 543 U.S. 37, 44 (2004) (per curiam) ("[T]he

*jury* must be given an effective vehicle with which to weigh mitigating evidence . . . ." (emphasis added)).  Bowling's jury did, in fact, consider mitigating factors.  *See, e.g.*, 25 T.E. 3744-45 (instruction to the jury on mitigating factors).  And the Kentucky Supreme Court found that the trial court "followed its duties when considering mitigation" by examining "all such mitigating evidence before imposing the death sentence."  *Bowling*, 942 S.W.2d at 306.  For his part, Bowling cites no federal case that requires a state court of appeals to make independent findings of mitigation evidence.  Nor can the Court find one. This claim also fails.

> ### B.    Access to Death Penalty Data (Claim 39)

Bowling also argues that the Kentucky Supreme Court unconstitutionally deprived him of data on Kentucky's use of the death penalty.  R. 1 at 191-92; R. 159 at 187-89.  The Kentucky Supreme Court denied this claim on direct appeal, holding that Kentucky Revised Statutes § 532.075(6) provided "sufficient standards" for Bowling to determine whether the state imposed the death penalty in an arbitrary manner.  *See Bowling*, 942 S.W.2d at 306 (internal quotation marks omitted) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (plurality opinion)).

Bowling contends that the Kentucky Supreme Court relied on some unspecified set of data in making its proportionality determination.  R. 1 at 191.  Without explaining what he hopes to find, Bowling alleges that the Kentucky Supreme Court's refusal to provide him with this data is contrary to the United States Supreme Court's decision in *Gardner v. Florida*, 430 U.S. 349, 360 (1977) (plurality opinion).  In *Gardner*, a jury recommended a sentence of life imprisonment for a defendant convicted of murder.  *Id.* at 352-53.  After receiving that recommendation, the trial judge ordered a presentence report, as he was

authorized to do under Florida law. *Id*. Without disclosing that report to the defendant, the trial judge then sentenced the defendant to death. *Id*. at 353. The Supreme Court vacated the defendant's death sentence, with a plurality holding that he was "denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." *Id*. at 362.

*Gardner* has little to do with Bowling's claim for two reasons. First, *Gardner* only prohibited a trial court from withholding a presentence report from a criminal defendant. A presentence report contains individualized information about a defendant that the trial court uses to fix a sentence. By contrast, an appellate court's proportionality review compares the case at hand to the circumstances of other similar cases. That review involves legal conclusions about whether a sentence is arbitrary, not factual findings about the defendant's personal history. Bowling does not allege that the Laurel Circuit Court withheld information from him or that the Laurel Circuit Court relied on any secret or confidential information before imposing his death sentence. As a result, his claim is distinguishable from the situation in *Gardner*.

Second, even if *Gardner* stood for the broader proposition that an appellate court may not rely on information that is unavailable to the parties, Bowling has not explained what nonpublic data he believes the Kentucky Supreme Court used to conduct its proportionality review. This Court cannot speculate on what legal research methods the Kentucky Supreme Court may or may not have used in its decision-making process. And unlike the presentence report in *Gardner*, all of the information cited by the Kentucky Supreme Court in its decision is available in the public record. Section 532.075(6) requires the Kentucky Supreme Court to consult all cases "in which the death penalty was imposed after January 1, 1970" in its

proportionality reviews.  In Bowling's case, the Kentucky Supreme Court did exactly that.  *See Bowling*, 942 S.W.2d at 306 (incorporating the list of cases reviewed in *Simmons v. Commonwealth*, 746 S.W.2d 393 (Ky. 1988)).  All of those cases are available to Bowling.  Since 1999, the Kentucky Supreme Court has posted all of its opinions online where the public can download and read them free of charge.  *See Searchable Opinions*, Kentucky Court of Justice, http://apps.courts.ky.gov/supreme/sc_opinions.shtm (last visited June 25, 2012).  Bowling can find decisions prior to 1999 in a variety of law reporters, including West's South Western Reporter (First through Third Series, 1886-present), the LexisNexis Kentucky Supreme Court Cases database (1785-present), or the Kentucky Reports (1795-1951).  *See Guide to Kentucky Case Law*, University of Louisville Louis D. Brandeis School of Law, http://www.law.louisville.edu/library/research/guides/ky-law/case-law (last visited June 25, 2012).  And although it is difficult to imagine what other data Bowling might need, he can always request that information from the Kentucky Supreme Court.  *See Ex Parte Farley*, 570 S.W.2d 617, 626 (Ky. 1978) (noting that all materials compiled as a part of the Kentucky Supreme Court's proportionality review in capital cases "will be open to the public . . . as soon as we have had the occasion and opportunity to examine and consider them ourselves").  Unlike the defendant in *Gardner*, Bowling knew exactly what the Kentucky Supreme Court was going to consider and all of that information was available to him.  Bowling is not entitled to habeas relief on this claim.

## III.   Confidential and Independent Defense Expert (Claim 8)

Bowling next argues that his constitutional rights were violated when Jeffrey Scott Doyle, a firearms examiner for the Kentucky State Police, testified as a prosecution expert witness.  R. 1 at 97.  Usually, few people would raise their eyebrows at a state police expert

testifying on behalf of the prosecution. But Doyle was no ordinary expert.  He was an independent examiner assigned to Bowling.  The trial court had previously ruled that Bowling was entitled to use state facilities for an "independent examination" of the ballistics evidence.  *See* Order Allowing Independent Analysis, July 9, 1992, 4 T.R. 463 (citing Ky. Rev. Stat. § 31.185, which allows public defenders "to use the same state facilities for the evaluation of evidence as are available to the attorney representing the Commonwealth").  The trial court then ordered Doyle to send his reports only to Bowling's lawyer.  *See* Order Transporting Evidence to Jefferson Regional Forensic Laboratory, Aug. 5, 1992, 4 T.R. 511.

But at some point, the prosecution learned of Doyle's conclusions and called him to testify at trial.  *See* 21 T.E. 3069-90.  Bowling then had the opportunity to cross-examine Doyle.  *See* 21 T.E. at 3090-93.  Now, Bowling argues that he was denied his constitutional right to a confidential and independent expert.  R. 1 at 97.

On direct appeal, the Kentucky Supreme Court summarily denied this claim.  *See* *Bowling*, 942 S.W.2d at 307 (noting that Bowling raised the claim on appeal); *id*. at 308 ("[W]e have reviewed each of the issues presented by the appellant and conclude that there was no error of sufficient gravity to warrant reversal of his convictions.").  Bowling contends that this summary denial was not an adjudication on the merits—and thus, that 28 U.S.C. § 2254(d)(1) does not apply to it—because Kentucky requires its appellate courts to provide reasons for their decisions.  *See* R. 159 at 132.

But state courts are presumed to decide all claims on the merits unless "there is reason to think some other explanation for the state court's decision is more likely." *Harrington*, 131 S. Ct. at 785.  Bowling does not provide a rationale for why the Kentucky Supreme Court would not have adjudicated his claim on the merits.  Instead, he posits that the court

must have denied his claim on an unknown non-merits basis because Kentucky procedural rules require the Supreme Court to explain its reasons.  This argument is nothing more than speculation.   The procedural rule in question, Ky. R. Civ. P. 76.28(1)(b), states that "[o]pinions and orders finally deciding a case on the merits shall include an explanation of the legal reasoning underlying the decision."  That language only requires an appellate court to explain why it grants or denies relief in its final judgments, not to provide a comprehensive rationale for why it affirms or denies each individual claim within a suit. Merely stating, as the Kentucky Supreme Court did, that "there was no error of sufficient gravity to warrant reversal of [Bowling's] convictions" was enough to satisfy Rule 76.28(1)(b).  That sentence explains why the court affirmed Bowling's convictions—because he did not suffer any prejudicial errors.  Any further detail makes that explanation more persuasive, but is not required by Rule 76.28.

Contrary to Bowling's speculation, the Kentucky Supreme Court repeatedly declared that it reviewed Bowling's claims on substantive, not procedural, grounds.  *Bowling*, 942 S.W.2d at 297 ("[W]e have carefully reviewed all issues both preserved and unpreserved . . . ."); *id.* at 298 ("[W]e have reviewed all allegations of error, both preserved and unpreserved . . . ."); *id.* at 308 ("[W]e have reviewed each of the issues presented by the appellant . . . .").  These statements establish that the Kentucky Supreme Court adjudicated Claim 8, as well the other claims it decided summarily, on their merits.[4]  This Court will not

---

[4] Because Bowling did not object to Doyle's testimony at trial or include Claim 8 in his motion for a new trial, the Kentucky Supreme Court might have refused to consider this claim on state-law procedural grounds.  *See* R. 114 at 62.  But the Kentucky Supreme Court did not choose to bar Bowling's claim, *see Bowling*, 942 S.W.2d at 298, and federal courts "have no concomitant duty to apply state procedural bars where the state courts themselves have declined to do so."  *Cone v. Bell*, 556 U.S. 449, 468-69 (2009).

second-guess why the Kentucky Supreme Court decided Claim 8 without detailed explanation. After all, a state court may have sound reasons to issue summary decisions. *See, e.g.*, *Harrington*, 131 S. Ct. at 784 ("The issuance of summary dispositions in many collateral attack cases can enable a state judiciary to concentrate its resources on the cases where opinions are most needed."). Moreover, this Court is cognizant that "[o]pinion-writing practices in state courts are influenced by considerations other than avoiding scrutiny by collateral attack in federal court." *Id*. Section 2254(d)(1)'s standard of review therefore applies to this claim.

Under that standard, Bowling is not entitled to relief. The Kentucky Supreme Court's decision on Claim 8 was not contrary to clearly established federal law for a very simple reason: there was no clearly established federal law in 1997 on confidential and independent experts.

Does the Constitution require a state to provide a defendant with the services of a ballistics expert? The United States Supreme Court has not spoken on the matter. Bowling cites *Ake v. Oklahoma*, 470 U.S. 68 (1985), to argue that due process entitled him to an expert, R. 1 at 99-100, but *Ake* dealt only with psychiatric experts, *see Ake*, 470 U.S. at 77. The United States Supreme Court expressly declined to reach the question of whether states must provide ballistics experts to indigent defendants. *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985) (explaining that there was no reason to decide whether the defendant was entitled to a ballistics expert because he had offered "little more than undeveloped

---

By contrast, the procedural-default doctrine generally bars federal courts from considering claims that the state courts have never had the opportunity to adjudicate. *See, e.g.*, *Sowell v. Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004) (quoting *Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000)).

assertions" that an expert would be "beneficial").  And in light of that reservation, the Sixth Circuit has held that *Ake* is limited to psychiatric assistance when the defendant's sanity is a significant factor at trial or when the prosecution presents evidence of future dangerousness at sentencing.  *Kordenbock v. Scroggy*, 919 F.2d 1091, 1120 (6th Cir. 1990) (en banc opinion of Kennedy, J., with five judges concurring and one judge concurring in the result); *see also Smith v. Mitchell*, 348 F.3d 177, 207 (6th Cir. 2003) (holding that an indigent capital murder defendant did not have right to any expert assistance after the defendant withdrew his insanity defense).  As a result, clearly established federal law did not entitle Bowling to the services of a state-funded ballistics expert.

Without the right to a state-provided expert, Bowling's claim for a confidential and independent expert must fail.  Some constitutional rights are predicated on the existence of another.  A litigant cannot, for example, claim ineffective assistance of counsel in most civil cases because there is no right to counsel in most civil cases.  *See, e.g.*, *Hardy v. Vieta*, 407 F. App'x 1, 3 (6th Cir. 2010).  By the same token, without the right to an expert, Bowling cannot have had the right to a confidential and independent expert.  *Cf. Powell v. Collins*, 332 F.3d 376, 392 (6th Cir. 2003) (predicating defendant's right to an independent psychiatric expert on his due-process right to a psychiatric expert).

Bowling nonetheless maintains that the prosecution's description of Doyle as a "defense expert" in direct examination and closing argument violated his due-process rights. R. 210 at 39; *see, e.g.*, 21 T.E. 3072 (asking Doyle if his examination was conducted at Bowling's request); 24 T.E. 3573 (telling the jury, in closing argument, that Bowling's "own expert" told them that one of his theories "wasn't worth nothing"); 24 T.E. 3587 (describing Doyle as Bowling's "own expert" in closing argument).

27

These statements were undoubtedly improper—Doyle testified at the behest of the prosecution, not the defense—but they were not so flagrant as to deny Bowling due process. Not every improper comment by a prosecutor is a constitutional violation.  A defendant's due-process rights are only harmed if a prosecutor's improper comments "infected the trial with unfairness."  *Parker v. Matthews*, 567 U.S. ___, 2012 WL 2076341, at *5 (June 11, 2012) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).  Prior to *Parker*, the Sixth Circuit evaluated prosecutorial misconduct claims under a four-factor test: (1) whether the statement tended to mislead the jury and prejudice the defendant; (2) whether the improper statements were isolated or pervasive; (3) whether the prosecutor deliberately made improper statements in front of the jury; and (4) whether the evidence against the accused is otherwise strong.  *United States v. Galloway*, 316 F.3d 624, 632 (6th Cir. 2003) (citing *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999)); *United States v. Carroll*, 26 F.3d 1380, 1387 (6th Cir. 1994)).  Although the Supreme Court questioned the vitality of the Sixth Circuit's "elaborate, multistep" test on habeas review, *Parker*, 2012 WL 2076341 at *6, even these factors do not support Bowling's claims.

Here, the prosecutor made the statements about Doyle in front of the jury, but the other three factors weigh against Bowling.   First, the prosecutor's statements were inaccurate, but they were not likely to mislead the jury or prejudice Bowling because Bowling's own attorney cross-examined Doyle and set the record straight in his closing argument.  *See* 21 T.E. 3090-93; 24 T.E. 3531 (referring to Doyle as "from the Kentucky State Police Lab in Louisville," rather than as a defense expert); *cf. Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986) (finding that a trial was not fundamentally unfair when defense counsel had "the opportunity to make a final rebuttal argument").

28

Second, although the prosecutor referred to Doyle as a defense expert several times, "all stages of trial" were not so "riddled with improper statements" as to make the improper comments pervasive.  *Galloway*, 316 F.3d at 633 (citing *Gall*, 231 F.3d at 312, which described a "broader strategy" of improper comments by the prosecutor).   Rather, the Kentucky Supreme Court held that Bowling "received a fundamentally fair trial."  *Bowling*, 942 S.W.2d at 308.  The Kentucky Supreme Court's conclusion that Bowling received a fair trial was not objectively unreasonable.  The trial court exceeded the federal constitutional minimum by giving Bowling the opportunity to conduct his own analysis of the ballistics evidence.   Bowling took advantage of that opportunity, using both Doyle and a private company, University Analytical Microscopy Associates, for analysis.  *See* Order of Sept. 9, 1992, 4 T.R. 554.

And third, the evidence against Bowling was otherwise strong.  Two other firearms experts gave testimony that matched Doyle's conclusions about the ballistics evidence.  *See* 20 T.E. 3018-61 (testimony of KSP laboratory examiners Ronnie Freels and Warren Mitchells).  As the Kentucky Supreme Court noted, "[s]ubstantial evidence was presented linking Bowling to the recovered handgun, and likewise linking the recovered handgun to all three crime scenes." *Bowling*, 2008 WL 4291670, at *3 (Ky. Sept. 18, 2008).  The improper statements about Doyle were not so flagrant as to deprive Bowling of due process.

Even though the prosecutor's improper comments did not make Bowling's trial fundamentally unfair, the Sixth Circuit has established an alternate route for defendants to show they suffered a due-process violation.   A defendant's due-process rights are harmed when (1) the other evidence against him was not overwhelming, (2) he objected at trial, and (3) there was no curative admonishment by the judge.  *Galloway*, 316 F.3d at 633 (citing

*United States v. Bess*, 593 F.2d 749, 757 (6th Cir. 1979)).  Bowling did not, however, object at trial.  *See* R. 114 at 63.  He therefore does not meet the requirements of this alternate test, and cannot show that the improper comments violated due process.  As a result, the Kentucky Supreme Court did not act contrary to clearly established federal law when it rejected Claim 8.

## IV.    Guilt Phase Instructions (Claims 9A, 9B, 9D)

### A.    *Failure To Instruct on Theft (Claim 9A)*

In addition to murder, Bowling was also convicted on counts of burglary and robbery. But he argues, that the trial court deprived him of due process by failing to instruct the jury on theft, which he believes was a lesser included offense of robbery.  R. 159 at 133-34.  The Kentucky Supreme Court summarily denied this claim, *see Bowling*, 942 S.W.2d at 307, so the Court must apply the § 2254(d)(1) standard of review.

As an initial matter, most state-court defendants do not have a constitutional right to jury instructions on lesser included offenses.  *See Bagby v. Sowders*, 894 F.2d 792, 796-97 (6th Cir. 1990) (en banc).  Compelling logic lies behind that limitation.  State law normally governs whether a trial court must instruct a jury on a lesser included offense.  When, as here, a state's highest court has reviewed a defendant's appeal and concluded that he was not entitled to a lesser included offense instruction, "that conclusion is axiomatically correct, as a matter of state law."  *Id.* at 795.  As a result, "the circumstances that would induce a federal court to overturn the state court determination would be extraordinary."  *Id.*

A capital offense is one such extraordinary circumstance.  In *Beck v. Alabama*, 447 U.S. 625, 637 (1980), the Supreme Court established that state courts must give juries the option of convicting on a lesser included offense when there is evidence that "leaves some

doubt with respect to an element that would justify conviction of a capital offense." *See also Spaziano v. Florida*, 468 U.S. 447, 455 (1984) ("The goal of the *Beck* rule . . . is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence."). Robbery is a non-capital offense, so under a strict reading of *Beck*, Bowling had no constitutional right to receive a lesser included offense instruction. Nevertheless, robbery was one of the aggravating factors that the jury relied on in the penalty phase to impose a death sentence. *See* 25 T.E. 3774. Out of an abundance of caution, the Court will therefore consider whether Bowling should have received a theft instruction.

Under Kentucky law, robbery requires that a person use or threaten "physical force upon another person with intent to accomplish the theft," Ky. Rev. Stat. § 515.020(1), while theft by unlawful taking requires only "control over movable property of another with intent to deprive him" of the property, *id*. § 514.030(1)(a). In Kentucky, a court must give a lesser included offense instruction when a reasonable juror could doubt that the defendant is guilty of the charged crime but conclude that he is the guilty of the lesser included offense. *Luttrell v. Commonwealth*, 554 S.W.2d 75, 78 (Ky. 1977) (citing *Muse v. Commonwealth*, 551 S.W.2d 564, 567 (Ky. 1977)). As a result, Bowling was entitled to a theft instruction only if a reasonable juror could conclude that he was guilty of theft but not robbery.

No reasonable juror could have reached that conclusion in Bowling's case. In his reply, Bowling argues that he was not primarily motivated by money and that he could have killed Hensley and Smith before he took any money from the cash registers. R. 159 at 133. But robbery does not require that a defendant intend *only* to accomplish a theft, just that he intend to accomplish a theft at all. An example may help illustrate this point. A husband

31

suspects another man is sleeping with his wife.  He walks into the bank where the other man works, shoots him, and takes millions of dollars from the bank's vault.  The husband may have been motivated chiefly by spite for his wife's lover, but he also intended to commit a theft and he used physical force to accomplish that theft.  The husband therefore committed robbery.

So, too, for Bowling—no matter whether his primary motivation was money, hatred of gas station attendants, or something else, he used physical force and took money from the stations' cash registers.  *See Oakes v. Commonwealth*, 320 S.W.3d 50, 58 (Ky. 2010) (holding that a defendant was only entitled to a theft instruction if "the jury could reasonably conclude that he committed theft without any physical force, as the use of force would elevate the crime" to robbery); *cf. Hobson v. Commonwealth*, 306 S.W.3d 478, 481 (Ky. 2010) (reasoning that the robbery statute encompasses all uses of force "in the course of committing theft," which includes "the time, place, and circumstances surrounding a theft" (quoting *Williams v. Commonwealth*, 639 S.W.2d 786, 787-88 (Ky. Ct. App. 1982))).  A reasonable jury could not have found that Bowling committed theft but not robbery.  Thus, the Kentucky Supreme Court's ruling was not contrary to clearly established federal law.

> B.    *Failure To Instruct on First-Degree Manslaughter (Claim 9B)*

Bowling also believes that the trial court should have instructed the jury on first-degree manslaughter.  R. 1 at 102-03.  As with the theft instruction, Bowling was only entitled to a manslaughter instruction if a reasonable juror could conclude that he was not guilty of murder but was guilty of first-degree manslaughter.  *See Luttrell*, 554 S.W.2d at 78.

In Kentucky, a defendant is guilty of first-degree manslaughter if he (a) intends to cause serious physical injury to another person but kills him, or (b) intentionally kills another

person while under the influence of an extreme emotional disturbance.  Ky. Rev. Stat. § 507.030(1).  Here, no reasonable juror could conclude that Bowling was guilty of first-degree manslaughter but not murder.  Smith and Hensley were each shot multiple times in the back of the head at close range.  23 T.E. 2730; *id.* at 2742-43.  No forensic wizardry is necessary to deduce that their shooter intended to kill, not injure.  Bowling also did not introduce any evidence that he was acting under the influence of an extreme emotional disturbance.  A jury would have therefore been hard-pressed to find that he was disturbed when he killed Hensley and Smith.  *See Sanders v. Commonwealth*, 801 S.W.2d 665, 679 (Ky. 1990) (holding that an emotional disturbance instruction is only proper "when there is probative, tangible and independent evidence of initiating circumstances, such as provocation" (quoting *Wellman v. Commonwealth*, 694 S.W.2d 696, 697 (Ky. 1985))).  As a result, Bowling was not entitled to a first-degree manslaughter instruction, and the Kentucky Supreme Court did not violate federal law when it denied this claim.

### C.  Instructions on Presumption of Innocence (Claim 9D)

Bowling also claims that his trial court erred by failing to properly instruct the jury to presume him innocent until proven guilty.  Specifically, Bowling believes that the trial court's instruction that "[t]he law presumes a defendant to be innocent of a crime" was not sufficient to guide the jury's deliberation.  R. 1 at 103-104 (quoting 5 T.R. 641).  Bowling has not, however, explained why he believes that instruction was insufficient.  The trial court also told the jurors that "the Indictment shall not be considered as evidence or as having any weight against" Bowling and that they should "find the defendant not guilty" unless they were "satisfied by the evidence alone and beyond a reasonable doubt that he is guilty."

33

5 T.R. 641.  These instructions were adequate to protect Bowling's constitutional rights to due process and a fair trial.

The Supreme Court has held that a state court's "failure to give a requested instruction on the presumption of innocence does not in and of itself violate the Constitution." *Kentucky v. Whorton*, 441 U.S. 786, 789 (1979) (per curiam).  Rather, a state court's failure to instruct the jury on the presumption of innocence "must be evaluated in light of the totality of the circumstances," which includes "all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors." *Id.*

The jury instructions in Bowling's case exceeded that constitutional minimum.  The trial court did not pluck its instructions from thin air.  Rather, the Supreme Court has described instructions as "well-suited" when they tell the jury that "the law presumes a defendant to be innocent of a crime," that the indictment is "in no way any evidence against the defendant," and that "nothing but legal evidence presented before a jury" can be used "in support of any charge against the accused." *Taylor v. Kentucky*, 436 U.S. 478, 483 nn. 5&6, 488 n.16 (1978). The Sixth Circuit's own pattern instructions for criminal trials also emphasize the same three points.  *See* Sixth Circuit Pattern Jury Instruction 1.03(1) ("The indictment is not any evidence at all of guilt."); Instruction 1.03(2) ("[T]he defendant starts the trial with a clean slate, with no evidence at all against him, and the law presumes that he is innocent."); *id.* ("This presumption of innocence stays with [the defendant] unless the government presents evidence here in court that overcomes the presumption").  Bowling's jury received instructions that closely tracked the Supreme Court's *Taylor* standard and the Sixth Circuit's pattern instructions.  The judge told the jurors that "[t]he law presumes a

defendant to be innocent of a crime," that they should not consider the indictment as evidence against Bowling, and that only evidence presented at trial could overcome the presumption of innocence. 5 T.R. 641. As a result, Bowling did not suffer any constitutional harm, and he is not entitled to relief on this claim.

## V.     Penalty-Phase Instructions (Claims 11, 12, 27, 35)

### A.     *Penalty-Phase Verdict Forms (Claim 11)*

Bowling believes that the verdict forms used in the penalty phase of his trial did not allow the jury to consider the full range of punishments available under Kentucky law. As a result, he claims that the forms violated his constitutional rights to a fair trial and to be free from cruel and unusual punishment. R. 1 at 105-07.

The trial court gave Bowling's jurors four possible sentencing options for each murder conviction: (1) imprisonment for twenty years; (2) imprisonment for life; (3) imprisonment for life without the possibility of parole for twenty-five years; and (4) death. 5 T.R. 659-60. For both convictions, the jury chose death and listed three aggravating factors. *Id.* at 664, 666. Bowling argues that the verdict forms did not allow the jurors to find an aggravating factor and give him one of the two less harsh sentences— imprisonment for twenty years or imprisonment for life with parole eligibility. R. 1 at 106. He believes that because there was space on the forms to list aggravating factors under the options of life imprisonment without parole eligibility for twenty-five years and death, the jury thought it was limited to those two sentences after it found an aggravating factor. *Id.*

As with Bowling's other claims, the § 2254(d)(1) standard of review applies to this claim. Bowling did not object to the verdict forms at trial. *See* R. 114 at 69. He did, however, raise this claim on direct appeal. *Bowling*, 942 S.W.2d at 307 (listing the claim as

alleged error (e)).  Despite the fact that this claim was unpreserved, the Kentucky Supreme Court summarily denied it, stating that "there was no error of sufficient gravity" to warrant reversing Bowling's convictions.  *Id*. at 308.  As the Court previously explained, § 2254(d)(1) applies to claims that the Kentucky Supreme Court adjudicated, even those that it rejected summarily.  *See* Claim 8, *supra* p. 23.  The Court can therefore grant Bowling relief only if the Kentucky Supreme Court's decision was contrary to clearly established federal law.

The Kentucky Supreme Court did not, however, violate federal law.  The jurors received not only verdict forms but also written instructions from the Court.  5 T.R. 653-60.  On review, the Court must consider the forms and instructions together.  *Slaughter v. Parker*, 450 F.3d 224, 241 (6th Cir. 2006) (citing *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)).  These instructions explained to the jurors that they had to find an aggravating factor as a prerequisite for imposing a harsher sentence.  5 T.R. 659-60.  They did not tell the jury that finding an aggravating factor *required* them to impose one of those harsher sentences.  *Id*.  Instead, the instructions clarified that Bowling's jury could consider the full range of penalties allowed under Kentucky law, so long as it found an aggravating factor before imposing one of the two harsher sentences.  *Accord Woodall v. Simpson*, Paducah No. 06-CV-216-R, 2009 WL 464939, at *29 (W.D. Ky. Feb. 24, 2009) (rejecting an identical claim that Kentucky's verdict forms misled the jurors in a death penalty case).

And even if the jurors were confused by the verdict forms, that confusion was harmless.  Assume, for the sake of argument, that Bowling is correct and the jurors believed that they had to select one of the two harsher sentences once they found an aggravating circumstance.  Given the choice between death and life imprisonment without parole

eligibility for twenty-five years, they picked death.  If the jury had picked the less severe of the two harsher sentences, Bowling might be able to argue that, if given the chance, the jurors would have given him one of the two milder sentences.  And so on.  By that logic, Bowling would have been entitled to verdict forms that listed every penalty available.  Nothing in federal law requires that level of detail.  Even under Bowling's theory of bamboozled jurors, the jury still picked the most severe sentence available.  Any confusion was therefore harmless, and Bowling is not entitled to relief on this claim.

### B.  Instructions on Unanimity for Mitigating Circumstances (Claim 12)

The trial court instructed Bowling's jury that it needed to reach a unanimous verdict on his penalty, but it did not instruct the jury that it had to reach a unanimous decision on the existence of any mitigating circumstances.  Instead, the court instructed the jury that "you shall consider such mitigating or extenuating facts and circumstances as have been presented to you in the evidence and you believe to be true."  5 T.R. 657.  These instructions did not, however, specify whether "you" referred to each individual juror or to the jury as a whole.  Bowling believes that this ambiguity violated *Mills v. Maryland*, 486 U.S. 367, 384 (1988), which held that a trial court may not instruct a jury that it has to reach a unanimous decision on the existence of a mitigating factor.  The Kentucky Supreme Court summarily denied this claim on direct appeal, *see Bowling*, 942 S.W.2d at 307 (listing "incomplete and erroneous instructions" as claim (c)), so the § 2254(d) standard of review applies.

As the Court previously noted, the parties agree that Bowling's jury received instructions similar to those in *Kordenbock v. Scroggy*, 919 F.2d 1091 (6th Cir. 1990) (en banc).  *See* R. 181; R. 159 at 144 (noting, in Bowling's reply brief, that his instructions were "materially the same as those given in *Kordenbock*").  In that case, Chief Judge Merritt wrote

for the majority on a *Miranda* issue not present in this case.  But on the issue of jury instructions, Judge Kennedy's majority opinion held that the instructions—which were very similar to those here—did not violate *Mills*.  The *Kordenbock* instructions expressly told the jurors that they needed to agree unanimously on the existence of an aggravating factor.  919 F.2d at 1121 (Kennedy, J.).  The instructions were silent, however, on whether the jurors needed to be unanimous on their mitigation findings.  *Id.*  *Kordenbock* reasoned that "it cannot be reasonably inferred from that silence" that the jurors would have believed they were required to act unanimously.  *Id.*  To the contrary, when compared with the explicit unanimity instruction on aggravating factors, silence on mitigating factors would likely cause the jury to assume that unanimity was *not* a requirement.  *Id.*  This makes sense.  If a court specifically instructs that an aggravating factor must be unanimous, but says nothing about unanimity with regards to mitigating factors, a reasonable jury would conclude that the unanimity requirement did not apply.

As the parties agree, Bowling's instructions were very similar to Kordenbock's.  The penalty-phase instructions and verdict forms forced the jurors to agree unanimously that aggravating circumstances existed beyond a reasonable doubt.  5 T.R. 656, 663, 666.  But the instructions were silent on whether the jury needed to be unanimous on the existence of mitigating circumstances.  *Id.* at 657.  Under the binding logic of *Kordenbock*, that silence did not violate *Mills*.  Moreover, the trial court's instruction on mitigating factors was separate from the instruction on unanimity.  *See* 5 T.R. 656, 657 (unanimity instructions and mitigating circumstance instructions on separate pages); *cf. Davis v. Mitchell*, 318 F.3d 682, 689-91 (6th Cir. 2003) (holding that a jury instruction violated *Mills* when it emphasized unanimity "immediately" before discussing mitigating factors and included twelve signature

38

lines on the verdict form).   As a result, Bowling cannot succeed on this claim.  *Accord Woodall*, 2009 WL 464939, at *28 (holding, based on *Kordenbock*, that identically worded jury instructions on mitigating factors did not violate *Mills*).

### C.  Aggravating Circumstance for Multiple Murders (Claim 27)

Bowling's jury found three aggravating circumstances justifying the death penalty: that he committed the murders in the course of committing first-degree burglaries, that he committed the murders in the course of committing first-degree robberies, and that he committed more than one murder.  5 T.R. 663.  In Claim 27, Bowling challenges the last of these three, claiming that Kentucky's multiple-murder aggravator violates the Eighth Amendment.  To pass constitutional muster, an aggravating factor "may not apply to every defendant convicted of a murder" and it "may not be unconstitutionally vague."  *Tuilaepa v. California*, 512 U.S. 967, 972 (1994).  Because the Kentucky Supreme Court summarily denied this claim in Bowling's direct appeal, the § 2254(d) standard of review applies.  *See Bowling*, 942 S.W.2d at 307 (listing "reciprocal use of mutually supporting aggravating factors" as claim (o)); Claim 8, *supra* p. 23.

Kentucky's multiple-murder aggravator meets both constitutional requirements. Kentucky law allows a jury to find an aggravating factor when "[t]he offender's act or acts of killing were intentional and resulted in multiple deaths."  Ky. Rev. Stat. § 532.025(2)(a)(6). This aggravator winnows the group of defendants eligible for the death penalty.   All murderers kill once, but only a few kill multiple times.  *See Tuilaepa*, 512 U.S. at 972.  A state might also reasonably believe that a defendant who kills more than once—and especially one who kills one victim, waits a period of time, and then kills another—is more culpable than a defendant who kills only once.  The multiple-murder aggravator therefore

both narrows the "class of person eligible for the death penalty" and "reasonably justif[ies] the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield v. Phelps*, 484 U.S. 231, 244, 246 (1988) (quotation omitted); *see also Fernandez v. McGrath*, No. C 02-4264 JF (PR), 2007 WL 1703631, at *9 (N.D. Cal. June 12, 2007) (upholding the constitutionality of California's multiple-murder aggravator because it "sufficiently limited the class of individuals subject to the death penalty").

Bowling, for his part, believes the multiple-murder aggravator was not sufficiently narrow because "anyone who is arrested on the suspicion of more than one murder is automatically eligible" for the aggravator. R. 159 at 175. That argument misstates the burden of proof for an aggravating factor. In Kentucky, a jury must find beyond a reasonable doubt that an aggravating factor existed. Ky. Rev. Stat. § 532.025(3). If, as Bowling suggests, a defendant were on trial for one murder, a jury would still need to find beyond a reasonable doubt that he had committed a second murder in order to apply the aggravating factor. Bowling's own trial court instructed the jurors that they could not find an aggravator unless they were "satisfied from the evidence beyond a reasonable doubt" that the factor was present. 5 T.R. 654; *see also* 5 T.R. 655 ("If you have a reasonable doubt as to the truth or existence of any aggravating circumstance . . . you shall not make any finding with respect to it."). The reasonable doubt standard demands far more proof than mere "suspicion." And even if Bowling's reasoning were correct, the multiple-murder aggravator would still be limited to a subgroup of murderers. Many murderers only kill once and give no sign they will attempt to kill again. Bowling was not one of those murderers; instead, he belongs to a subgroup of convicted murders who killed more than one person.

The multiple-murder aggravator was also not unconstitutionally vague. "When a federal court is asked to review a state court's application of an individual statutory aggravating or mitigating circumstance . . . it must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer." *Walton v. Arizona*, 497 U.S. 639, 654 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584, 589 (2002). Bowling argues that Kentucky's multiple-murder aggravator is overly vague because it "does not say whether it applies only to multiple murders committed in the same act or criminal enterprise or to any situation where more than one murder took place . . . prior to the capital murder trial." R. 159 at 176. Yet this argument ignores the statute's objective standard: whether the defendant's acts caused "multiple deaths." *Cf. Bell v. Cone*, 543 U.S. 447, 449, 457 (2005) (per curiam) (holding that Tennessee's aggravating factor for "especially heinous, atrocious, or cruel" murders was not unconstitutionally vague). Multiple means "more than one," Merriam-Webster's Collegiate Dictionary 816 (11th ed. 2003), and the legislature used the word "multiple" rather than "simultaneous." The statute also refers to "[t]he offender's act *or acts* of killing," indicating that the aggravator can apply to a murderer who kills more than one person at a single time or different people at different times. Ky. Rev. Stat. § 532.025(2)(a)(6) (emphasis added). And finally, Kentucky courts have consistently held that the multiple-murder aggravator applies to separate murders. *See, e.g.*, *Parker v. Commonwealth*, 291 S.W.3d 647, 677 (Ky. 2009); *Thomas Clyde Bowling v. Commonwealth*, 873 S.W.2d 175, 181 (Ky. 1993); *Simmons*, 746 S.W.2d at 398-99. Those decisions remove any lingering doubt about the meaning of the multiple-murder aggravator. *See Walton*, 497 U.S. at 654 (noting that if the language of an aggravating factor is vague, state court decisions may "further define[] the

vague terms" to provide guidance to the sentencer); *see also Fernandez*, 2007 WL 1703631, at *9 (holding that California's multiple-murder aggravator was not unconstitutionally vague).

In short, the multiple-murder aggravator was neither unconstitutionally broad nor unconstitutionally vague.  Bowling is not entitled to relief on this claim.

D.      *Penalty-Phase Instructions (Claim 35)*

Bowling raises five additional objections to the trial court's instructions to the jury in the penalty phase.  The Kentucky Supreme Court summarily denied this claim on direct appeal, *see Bowling*, 942 S.W.2d at 307 (listing "incomplete and erroneous instructions" as claim (c)), so the § 2254(d) standard of review applies.

## 1.      Jury Instructions on Mitigating Factors (Claim 35A)

First, Bowling argues that the trial court should have given the jury two additional instructions on mitigating factors.   His lawyer asked for instructions on emotional disturbance and impaired mental capacity as mitigators.  25 T.E. 3736-39.  But the trial court denied his requests because Bowling did not present any evidence to support these instructions.  *Id*. at 3737.

That decision was sound.  Supreme Court precedent requires a capital sentencing jury to consider in mitigation "any aspect of a defendant's character . . . that the defendant proffers as a basis for a sentence less than death."   *Lockett*, 438 U.S. at 604 (plurality opinion).   But "[n]othing in the Constitution obligates state courts to give mitigating circumstance instructions when no evidence is offered to support them."   *Delo v. Lashley*, 507 U.S. 272, 277 (1993).  Indeed, Bowling would arguably have a due-process claim if the trial court *had* given instructions on mitigating factors that were absent from the evidence.

*See, e.g.*, *Roberts v. Louisiana*, 428 U.S. 325, 334-36 (1976) (plurality opinion) (holding that an instruction on a lesser included offense was impermissible when there was "not a scintilla of evidence" to support the instruction); *Combs v. Coyle*, 205 F.3d 269, 292 (6th Cir. 2000) (noting that a state court erroneously gave instructions on all possible mitigating factors, including those unsupported by the evidence).  Bowling had the burden of showing that he suffered from extreme emotional disturbance or impaired capacity when he committed the murders.  *See Walton*, 497 U.S. at 649-50.  Yet he presented no evidence that he was emotionally disturbed when he killed Smith or Hensley, and in his habeas petition, he cites only his controlling relationship over his wife as evidence of mental illness.  R. 1. at 171. But the trial record does not indicate that Bowling was mentally ill.  Bowling's witnesses in the penalty phase testified that he was friendly, devoted to his wife, and a good student.  *See, e.g.*, 24 T.E. 3667 (testimony from Bowling's mother describing him as "friendly" and "quiet"); 25 T.E. 3673 (Bowling's mother calling him "a good boy" who "didn't cause no trouble"); *id.* at 3676 (Bowling's mother saying that he "was in love with his wife" and "very attentive" to her);  *id.* at 3681 (testimony from Bowling's high school principal that he was as "an average[,] maybe above average" student who did not have any discipline problems); *id.* at 3688 (testimony from Bowling's bus driver and basketball coach that he was "very polite, mannerable," and "well behaved").  The Kentucky courts found that these facts were not enough to merit emotional disturbance or mental illness instructions, *see* 25 T.E. 3737, and Bowling has not explained why these finding were unreasonable.  *See* 28 U.S.C. § 2254(d)(2).  As a result, he cannot prevail on this claim.

## 2.      Directed Verdict on Mitigating Factors (Claim 35B)

Second, Bowling argues that the trial court should have entered a directed verdict on the mitigating factors of youth and lack of criminal history.  R. 1 at 172.  Bowling is correct that his age and lack of criminal history were not in dispute.  But this claim quickly hits a roadblock: Bowling had no constitutional right to a directed verdict on mitigating circumstances.  *See McQueen v. Scroggy*, 99 F.3d 1302, 1331-32 (6th Cir. 1996), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174, 179-82 (6th Cir. 2004) (en banc).  No Kentucky case endorses the concept of a directed verdict for a mitigating circumstance, and no federal case requires it.  *Id*. at 1331.  And in Kentucky, no matter how many mitigating circumstances are present, a jury can impose the death penalty so long as it also finds at least one aggravating circumstance.  Ky. Rev. Stat. § 532.025(3).  Even if Bowling had been entitled to a directed verdict on two mitigating circumstances, the jury could have still recommended a death sentence.  Consequently, Bowling cannot succeed on this claim.

## 3.      "Life Option" Instruction (Claim 35D)

Third, Bowling believes that the trial court erred by failing to instruct the jury that it could give him a lesser sentence than death even if it found an aggravating factor.  R. 1 at 174-75.  As the Court explained in Claim 11, *supra* p. 35, the trial court explained to the jurors that they had to find an aggravating factor as a prerequisite for imposing the two most severe possible sentences: death or life imprisonment without parole eligibility for twenty-five years.  5 T.R. 659-60.  The trial court did not tell the jury that finding an aggravating factor *required* them to impose one of those sentences.  *Id*.  Instead, the instructions clarified that Bowling's jury could consider the full range of penalties allowed under Kentucky law as long as it found an aggravating factor before imposing one of the two harsher sentences.

*Accord Woodall*, 2009 WL 464939, at *29 (rejecting a claim that Kentucky's verdict forms misled the jurors in a death penalty case).  Nothing was improper about the trial court's instructions about the range of available sentencing options.

### 4.    Adverse Inference Instruction (Claim 35F)

Fourth, Bowling claims that the trial court should have instructed the jury not to draw an adverse inference from his decision not to testify in the penalty phase.  R. 1 at 176-77.  The jury received that instruction, known as a "*Carter*" instruction after the case of *Carter v. Kentucky*, 450 U.S. 288 (1981), during the guilt phase.  5 T.R. 643.  The trial court did not, however, repeat that instruction in the penalty phase.

Bowling argues that a trio of Supreme Court decisions established his right to a *Carter* instruction in the penalty phase.  First, he claims that *Carter* established a constitutional requirement for state courts to give a no-adverse-inference instruction.  450 U.S. 288.  Second, he points to language from *Estelle v. Smith*, 451 U.S. 454 (1981), which declared that there is "no basis to distinguish between the guilt and penalty phases" of a capital trial "so far as the protection of the Fifth Amendment privilege [against self-incrimination] is concerned."  *Id.* at 462-63.  And third, he notes that *Mitchell v. United States*, 526 U.S. 314, 328-29 (1999), held that federal courts, when determining the facts of an offense, may not draw an adverse inference from the defendant's silence in sentencing proceedings.  From these three cases, Bowling posits that state courts must give a *Carter* instruction to juries in the penalty phase of a capital trial.

Yet this argument has several fatal flaws.  First, *Carter* itself required an instruction in the guilt phase *only* upon the defendant's request.  450 U.S. at 305.  Here, it is undisputed that Bowling did not request an instruction.  *See* 25 T.E. 3734-40.  That alone is fatal to his

claim.  Bowling does not cite any U.S. Supreme Court decision for the proposition that a state court must give a *Carter* instruction in the penalty phase even when the defendant fails to request one.  *See* R. 1 at 177 (citing decisions by Illinois and Texas state courts requiring a *Carter* instruction in the penalty phase); R. 159 at 184 (citing no cases for the proposition that a defendant is entitled to an instruction despite not requesting one).  And lower federal courts have held that a defendant is entitled to a *Carter* instruction in the penalty phase of a capital trial but only when he requests one.  *See, e.g.*, *United States v. Whitten*, 610 F.3d 168, 197, 202 (2d Cir. 2010) (holding that the trial court erred by denying the defendant's request for a *Carter* instruction in the penalty phase); *Burns v. Dep't of Corr.*, No. 8:07-cv-1275-T-23AEP, 2011 WL 3563102, at *5-8 (M.D. Fla. Aug. 10, 2011) (holding that a trial court erred by rejecting a defendant's request for a *Carter* instruction, but that the error was harmless); *Woodall*, 2009 WL 464939, at *12 ("Woodall requested a no adverse inference instruction.  Once requested, it should have issued." (citing *Carter*, 450 U.S. at 305)). *Carter*'s limitation is clear: when a defendant fails to request a no-adverse-inference instruction in the penalty phase, a trial court has "no duty to provide one."  *Higgs v. United States*, 711 F. Supp. 2d 479, 547 (D. Md. 2010) (citing *Carter*, 450 U.S. at 305).  Nothing in clearly established federal law requires a court to bypass that limitation on direct appeal, let alone under the heightened standard of habeas review.  *See Williams v. Taylor*, 529 U.S. 362, 405-13 (2000) (opinion of O'Connor, J.) (outlining the "contrary to" and "unreasonable application" standards of § 2254(d)(1)).

Second, *Estelle*'s statement that Fifth Amendment rights are identical in the guilt and sentencing phases was dictum.  Only "the holdings" of the Supreme Court's decisions, "as opposed to the dicta," are "clearly established" federal law.  *Williams*, 529 U.S. at 412

(2000).  And in any event, other Supreme Court cases undercut the notion that all of the Fifth Amendment's protections carry over into sentencing proceedings.  The Due-Process Clause of the Fifth Amendment requires the prosecution to prove the essential facts of a crime beyond a reasonable doubt in the guilt phase of a trial but not at sentencing.  *McMillan v. Pennsylvania*, 477 U.S. 79, 92 (1986).  Thus, in at least one respect, the Fifth Amendment provides less protection to criminal defendants at sentencing.  The Fifth Amendment's privileges also apply "in any criminal case," a term virtually indistinguishable from the Sixth Amendment's guarantee of rights "[i]n all criminal prosecutions."  U.S. Const. amends. V & VI.   Yet several Sixth Amendment rights do not apply in sentencing proceedings.  Defendants have the constitutional right to a jury trial and to confront adverse witnesses in the guilt phase of a trial but not at sentencing.  *See Spaziano*, 468 U.S. at 462-63; *Williams v. New York*, 337 U.S. 241, 252 (1949).  And even if *Estelle* did extend *Carter*'s protections to the penalty phase of a capital trial, Bowling's claim would still fail because, as noted earlier, he did not request a second no-adverse-inference instruction.

Third, *Mitchell*, which held that federal courts may not draw an adverse inference about the facts of an offense based on the defendant's silence in sentencing proceedings, was decided in 1999.  Its holding therefore could not have been clearly established when the Kentucky Supreme Court denied Bowling's direct appeal in 1997.  *See Williams*, 529 U.S. at 390 (opinion of Stevens, J.) (holding that AEDPA limits a federal court to applying "a rule of law that was clearly established at the time [the defendant's] state-court conviction became final").   *Mitchell* also expressly declined to reach the question of whether a federal sentencing court could draw an adverse inference as to a defendant's "lack of remorse or acceptance of responsibility" based on his failure to testify.  526 U.S. at 330.  Although

*Mitchell* arose in the context of the federal sentencing guidelines, this limitation means the decision may not carry as much force in the penalty phase of a state-court capital trial. Whether a defendant expresses remorse is a key question a jury might consider in the penalty phase. *See, e.g.*, *Lockett*, 438 U.S. at 604 (describing how sentencing juries in capital cases should take into account "any aspect of a defendant's character or record and any of the circumstances of the offense"). For these reasons, the Kentucky Supreme Court's decision was not contrary to clearly established federal law.

One final note: Bowling has also not presented any evidence to suggest that the jury might have drawn an adverse inference from his failure to testify in the penalty phase. Bowling did not testify in the guilt phase, and the trial court instructed the jury not to consider that decision "in any way in arriving at a verdict." 5 T.R. 643. The jury might have presumed that instruction would still apply in the penalty phase, even without hearing it again. Bowling also maintained his innocence throughout trial. *See, e.g.*, R. 159 at 154. The jury hardly would have expected him to take the stand in the penalty phase to show remorse or ask for mercy for crimes he denied committing. And Bowling's failure to ask for a second *Carter* instruction is at least some evidence that he did not believe a second one was necessary.

In an ideal world, the trial court might have repeated its guilt-phase *Carter* instruction before the jury deliberated on Bowling's sentence. But the Kentucky Supreme Court's rejection of Bowling's claim was not contrary to clearly established federal law. As a result, Bowling cannot prevail on this claim.

### 5.   Mitigation Limited to Penalty-Phase Evidence (Claim 35H)

Finally, Bowling alleges that the trial court improperly limited the jury's deliberations to evidence that was offered during the penalty phase.   He believes that this error was "devastating" because he presented mitigating evidence in the guilt phase.   R. 1 at 177-78.

This is a curious complaint.   At the start of the penalty phase, the trial court expressly instructed the jury that it could "consider the evidence . . . presented during the guilt or innocence phase."   24 T.E. 3637.   Indeed, the parties discussed this at the bench and the trial court told them that "[the jury] clearly can consider the evidence that was presented during the guilt or innocence phase."   *Id.* at 3636.   And in its mitigating circumstance instruction, the trial court told the jury to consider "[a]ny other circumstance, or circumstances arising from the evidence which you, the jury, deem to have mitigating value."   5 T.R. 657; 25 T.E. 3745.   Based on those instructions, the jury was free to rely on evidence from both phases of trial to find any mitigating circumstances.   Contrary to Bowling's assertion, the trial court expressly permitted the jury to consider evidence from both the guilt and penalty phase of the trial.   Thus, Bowling did not suffer any harm, let alone constitutional harm.

## VI.   Speedy Trial Right and Denial of Motions for Continuances (Claims 14, 28, 31)

### A.   *Speedy Trial Right (Claim 14)*

More than three and a half years passed between Bowling's arrest in February 1989 and his trial in September 1992.   In Claim 14, Bowling argues that this delay violated the Sixth Amendment's guarantee of a speedy trial.   Bowling raised this claim on direct appeal, and the Kentucky Supreme Court summarily denied it.   *See Bowling*, 942 S.W.2d at 307 (listing the claim as alleged error (f)).   Thus, the § 2254(d)(1) standard of review applies to this claim, *see* Claim 8, *supra* p. 23.

*Barker v. Wingo*, 407 U.S. 514 (1972), established four factors for determining whether a delay violates the Speedy Trial Clause: the length of the delay, the reason for the delay, the defendant's assertion of his right, and the prejudice to the defendant. *Id.* at 530. The first factor is a threshold inquiry. Any delay of more than one year—no matter its cause—triggers an analysis of the remaining factors. *See Doggett v. United States*, 505 U.S. 647, 651-52 (1992). Because more than a year elapsed between Bowling's arrest and trial, the other three *Barker* factors are relevant.

The second *Barker* factor focuses on the reason for the delay. A delay motivated by the government's bad faith, harassment, or attempts to seek a tactical advantage weighs heavily in favor of a constitutional violation, while neutral reasons such as negligence weigh less heavily. *See Barker*, 407 U.S. at 531. Valid reasons for a delay—such as locating witnesses or resolving a defendant's pretrial motions—weigh against a violation. *See id.*

Although the trial court certainly could have acted more quickly, a review of the record shows that Bowling was responsible for more than half of the delay before his trial. Trial was initially scheduled for January 8, 1990, but Bowling's attorney asked for a continuance until the spring so that he could prepare. 2 T.R. 239. Bowling then gave notice that he planned to raise an insanity defense, *id.* at. 242, so the trial court ordered a psychiatric evaluation for him, *id.* at 243-44. That evaluation was not completed until August 1990, *see* 2 Supp. T.R. 24 (docket sheet showing a confidential report from the Kentucky Correctional Psychiatric Center dated August 6, 1990). Shortly thereafter, Bowling's first lawyer withdrew from the case because he was elected as a county judge. 2 T.R. 253. In December 1990, the prosecution pressed the trial court to set a trial date, *id.*, but Bowling did not settle on new attorneys until February 1991. *See id.* at 260-63 (first noting Gary N. Hudson as

50

Bowling's attorney).  That month, the trial court ordered the prosecution to turn relevant discovery materials over to Bowling, held a hearing on Bowling's motion to reduce his bond, and set a new trial date for August 12, 1991.  *See id*. at 260-62, 269.  But that trial date was also continued after Bowling's second set of lawyers filed a number of motions, including a petition for a change of venue, an ex parte motion for funds for an expert witness, and a motion for additional peremptory challenges.  *See id*. at. 273-90.  Then in September 1991, Bowling changed lawyers again.  3 T.R. 304-05.

Once Bowling received a new lawyer (his third), he filed a steady stream of motions. *See, e.g.*, 3 T.R. 335-38 (motion to require the prosecution to disclose criminal records about prosecution witness Timothy Chappell); *id*. at 339-41 (motion for independent examination of evidence); *id*. at 371-77 (motion to reconsider denial of change of venue motion); *id*. at 386-92 (motion to restrict use of victim impact testimony); *id*. at. 393-94 (motion to preclude commenting on the possibility of appeal); *id*. at. 395-96 (motion to preclude suggesting that the jury would be obligated to impose the death penalty if it found an aggravating factor but no mitigating factors); *id*. at 397-98 (motion to preclude suggesting that the jury's imposition of the death penalty would only be a recommendation); *id*. at 399-401 (request for discovery of all evidence of aggravating factors); *id*. at 402-19 (motion to suppress statements Bowling made to Timothy Chappell); 4 T.R. 468 (motion to preclude the prosecution from seeking the death penalty); *id*. at. 573-75 (motion to obtain the psychological records of Bowling's ex-wife, Ora Lee Isaacs).  Many of these motions were complex, and, not unreasonably, the trial court required a substantial amount of time to resolve them.  For example, Bowling filed a seventeen-page motion to suppress on May 22, 1992, *see* 3 T.R. 402-19, and the trial court ruled on that motion on August 4, 1992, *see* 4 T.R. 508-09.  The trial court can hardly be

responsible for the two and a half months the motion was pending.  In fact, between Bowling's request for a speedy trial and new counsel in August 1991 and his trial in September 1992, he filed thirty-six different motions.  *See* 2 Supp. T.R. 30-34 (docket sheet listing Bowling's motions as entries 48, 57, 60, 63, 64, 65, 74, 76, 77, 78, 79, 80, 81, 82, 83, 89, 90, 109, 110, 111, 114, 126, 127, 128, 151, 156, 159, 160, 165, 166, 167, 171, 172, 177, 178, and 179).  Although it was perfectly reasonable for Bowling's counsel to file these motions, Bowling cannot now turn around and complain that the trial court's time in considering the motions was unfair delay.

Rough calculations show that more than half of the pretrial delay was attributable to Bowling.  The three-month delay between January and April 1990, for instance, was caused by Bowling's motion to continue.  Of course, Bowling himself is not to blame for his lawyers' need for extra time to prepare.  But because a defendant's attorney is his agent, delays caused by a defendant's lawyers are attributable to the defendant himself.  *Coleman v. Thompson*, 501 U.S. 722, 753 (1991).  The trial court spent from April 1991 to August 1991 dealing with motions by Bowling's second lawyer.  *See* 2 T.R. 273-90.  And the thirteen months between August 1991 and September 1992 were consumed almost exclusively with resolving Bowling's thirty-six pretrial motions.  As a result, at least twenty-two of the forty-three months of delay between Bowling's arrest and trial (or fifty-one percent) were attributable to Bowling's conduct.  During the other twenty-one months, the trial court might have been able to do more to nudge Bowling more quickly towards trial.  Yet the trial court cannot be faulted for exercising caution and diligence in building a thorough record in a capital case.  Nothing in the record suggests that pretrial delays were related to bad faith, harassment, or a government desire to seek a tactical advantage.  Even assuming the trial

court was negligent in pushing a faster setting of the trial date, such negligence would weigh "less heavily" than bad faith when determining whether a speedy trial violation exists, *see Barker*, 407 U.S. at 531.   And in this case, any negligence is tempered by Bowling's own responsibility for more than half of the delay.   As a result, the second factor weighs against Bowling.

The third *Barker* factor is whether the defendant asserted his speedy trial right.   This factor "is entitled to strong evidentiary weight" because "[t]he more serious the deprivation, the more likely a defendant is to complain."   *Barker*, 407 U.S. at 531-32.   Bowling filed a pro se motion asserting his speedy trial right on August 5, 1991.   This assertion came nearly two and a half years after his arrest, 3 T.R. 301, but that is enough for this factor to weigh in Bowling's favor.   Yet because Bowling asserted his right at the same time that he began filing numerous pretrial motions, this factor cannot weigh as heavily as the other three factors.   *See United States v. Loud Hawk*, 474 U.S. 302, 314-15 (1986) (holding that two defendants' assertion of their speedy trial rights "must be viewed in the light of [their] other conduct" at the same time, which included filing "repetitive and unsuccessful motions").

The final *Barker* factor requires the defendant to show that "substantial prejudice" resulted from his delayed trial.   *United States v. DeClue*, 899 F.2d 1465, 1470 (6th Cir. 1990).   The Supreme Court has identified three relevant forms of prejudice in speedy trial cases: (1) "oppressive pretrial incarceration"; (2) the "anxiety and concern of the accused"; and (3) "'the possibility that [the accused's] defense will be impaired' by dimming memories and loss of exculpatory evidence."   *Doggett*, 505 U.S. at 654 (quoting *Barker*, 407 U.S. 514 at 532).   "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."   *Barker*, 407 U.S. at

532; *but see Doggett*, 505 U.S. at 661 (Thomas, J., dissenting) (arguing that the Speedy Trial Clause protects against pretrial deprivations of liberty, not impairments to the accused's ability to defend himself).

Bowling claims that his pretrial incarceration was oppressive and that he suffered from anxiety and concern before trial. *See* R. 1 at 116. Bowling was incarcerated for the entire period between his arrest and trial, but there are no signs that his detention was particularly oppressive. The trial court set bail at $250,000, which, while high, was well within its discretion under Kentucky law for a defendant in a capital case. *See* Ky. Const. § 16 ("All prisoners shall be bailable by sufficient securities, unless for capital offenses when the proof is evident or the presumption great . . . ."). And although his detention undoubtedly led to anxiety and concern, the Sixth Circuit has held that a defendant must show specific prejudice, that is, that the delay impaired his defense, when the government has been "diligent in its prosecution." *United States v. Young*, 657 F.3d 408, 418 (6th Cir. 2011). Here, in a capital case where more than half of the delay was attributable to Bowling and the trial court sought to build a thorough record, the government was reasonably diligent. And lastly, Bowling did not assert his speedy trial right until August 1991. Any psychological stress was not great enough to lead Bowling to complain until he was detained for more than two years, suggesting that his anxiety was not severe.

The real crux of Bowling's prejudice argument is the third factor, that his defense was impaired by a trial that did not begin until September 1992. Bowling claims that because of the lengthy delay, several witnesses were unable to remember facts that were favorable to his defense. *See* R. 1 at 116-17. Bowling is correct that some witnesses were unable to recall certain facts at trial. *See, e.g.*, 17 T.E. 2577-78 (testimony of Oda Proffitt); 18 T.E. 2701

(testimony of David Gross). Nevertheless, Bowling's attorney was able to refresh these witnesses' recollection with their prior written statements, lessening any prejudice from their hazy memories. *See, e.g.*, 17 T.E. 2577-78 (refreshing Proffitt's recollection about her statement to police officers that a strange white van repeatedly drove by Ronnie Lee Smith's house); 18 T.E. 2708-09 (refreshing Gross's recollection about his prior statement that he loaned a young man money, leading Gross to admit making the statement). Of course, a defendant can suffer prejudice from a delayed trial if witnesses are no longer available to testify. *See, e.g.*, *Dixon v. White*, 210 F. App'x 498, 502 (6th Cir. 2007); *Maples v. Stegall*, 427 F.3d 1020, 1034 (6th Cir. 2005). But witnesses for both the prosecution and defense suffer memory lapses over time. A lengthy delay is thus likely to weaken the prosecution's case more than the defense's because "it is the prosecution which carries the burden of proof." *Barker*, 407 U.S. at 521. Standing alone, the fact that Bowling's lawyer needed to refresh the recollection of a few witnesses is not enough to establish prejudice. *Cf. United States v. Mohawk*, 20 F.3d 1480, 1488 (9th Cir. 1994) (pointing out that a defendant does not suffer prejudice if he can refresh the memories of forgetful witnesses at trial using previous written records).

Bowling's other claims of prejudice are nothing more than speculation. For instance, he claims that if trial had been held sooner, Bowling's ex-wife Ora Lee Isaacs would have been able to remember being in Indiana with her husband on January 20, 1989, the day Ronald Smith was murdered. R. 1 at 117. But when she testified, Isaacs did not say she could not remember where she and her husband were that day. Rather, she said that they were at home in Clay County, Kentucky. 21 T.E. 3208. An earlier trial would not have caused her to change the substance of her testimony. Similarly, Bowling claims that if he

had been tried sooner, he and his ex-wife might still have been married and the marital privilege would have blocked her testimony. R. 1 at 117. But Ronnie Lee Bowling and Ora Lee Isaacs divorced in January 1990, *see* 21 T.E. 3192-93, well before Bowling asserted his speedy trial rights and before his psychiatric evaluation was complete. In fact, Bowling requested a continuance that moved the trial date from January 1990 to the spring of that year so his lawyer would have more time to prepare. 2 T.R. 239. Unless Bowling had faced trial almost immediately after his arrest, he and Ora Lee Isaacs would have been divorced.

Bowling also argues that if he were tried sooner, his aunt Ezell DeMoss would have been able to remember why her diary entry for January 20, 1989, was written in a different style of pencil. R. 1 at 117. DeMoss claimed that Bowling was in Indiana that day, which would have provided him an alibi for the Ronald Smith murder. *See* 22 T.E. 3266. DeMoss did not, however, say that she was unable to remember why she used a different pencil, just that she wrote the entry "a long time ago." *Id*. This forgetfulness can only be prejudicial to Bowling through a string of conjectures: first, that DeMoss would have remembered why she used a different pencil if trial had been held sooner; second, that her explanation would have been convincing to the jury; and third, that the jury would have found her more credible than Ora Lee Isaacs, who said that she and Bowling were at home in Kentucky that day. The mere possibility of more favorable testimony, unsupported by material facts, is not substantial prejudice.

Admittedly, prejudice is also the most difficult factor for defendants to prove because "time's erosion of exculpatory evidence and testimony 'can rarely be shown.'" *Doggett*, 505 U.S. at 655 (quoting *Barker*, 407 U.S. at 532). The Supreme Court has thus recognized that if a delay is long enough, a court can infer prejudice to the defendant. *Id*. at 655-56. But

only a "shockingly" long delay will give rise to that inference. *United States v. Schreane*, 331 F.3d 548, 559 (6th Cir. 2003); *see also United States v. Ferreira*, 665 F.3d 701, 710 (6th Cir. 2011) (Kethledge, J., dissenting) ("[B]efore applying the presumption [of prejudice], we should at least ask whether there is reason to believe that the defendant has suffered significant, albeit unidentifiable, prejudice as a result of the government's delay in bringing him to trial."). Bowling's three-and-a-half-year delay is at least two years less than delays that courts have found "shockingly" long. *See, e.g.*, *Doggett*, 505 U.S. at 657 (six years); *United States v. Brown*, 169 F.3d 344, 351 (6th Cir. 1999) (five and a half years); *United States v. Graham*, 128 F.3d 372, 376 (6th Cir. 1997) (eight years); *see also United States v. Mundt*, 29 F.3d 233, 236-37 (6th Cir. 1994) (holding that the United States "persuasively rebutted" any inference of prejudice from a delay of three and a half years by showing that the delay did not impair the accused's defense). And when the government prosecutes its case "with reasonable diligence," a defendant is not entitled to an inference of prejudice. *United States v. Howard*, 218 F.3d 556, 564 (6th Cir. 2000) (citing *Doggett*, 505 U.S. at 656). Here, a delay of three and a half years—more than half of which was attributable to Bowling's conduct—was not so shocking as to trigger an inference of prejudice.

Bowling's prejudice argument is also puzzling in light of his other habeas claims. In Claim 28, Bowling argues his constitutional rights were violated because the trial court *refused* to grant additional continuances that would have further delayed his trial. *See* R. 1 at 152-54. These motions were related to pretrial publicity and evidence that the prosecution allegedly disclosed on the eve of trial. *Id.* Regardless of whether these motions had merit, Bowling's willingness to wait even longer than three and a half years for trial is at least some evidence that he did not believe he would suffer substantial prejudice from further delay.

In sum, more than one year passed between Bowling's arrest and his trial, and Bowling asserted his speedy trial right before trial. The first and third *Barker* factors therefore favor him. But because Bowling asserted his speedy trial right while simultaneously delaying the trial court with a number of other motions, the third factor weighs less heavily than it otherwise would. Bowling's motions also caused at least half of the pretrial delay, so the second *Barker* factor weighs against him. And because Bowling has not shown that he suffered substantial prejudice from the delay, the fourth *Barker* factor weighs against finding a speedy trial violation.

In light of the split between the four *Barker* factors, the Kentucky Supreme Court's denial of Bowling's speedy trial claim was not an unreasonable application of clearly established federal law. Speedy trial determinations are a "slippery" and "difficult and sensitive balancing process" that cannot be "quantified into a specified number of days or months." *Barker*, 407 U.S. at 522–23, 533; *see also United States v. Watford*, 468 F.3d 891, 901 (6th Cir. 2006) ("The Supreme Court has rejected rigid rules for determining when a Sixth Amendment speedy trial violation has occurred in favor of an ad hoc balancing approach."). On one side of the speedy trial scale, two factors weigh in favor of a violation. One of those two, the third factor, only weighs slightly in favor and the first factor is simply a threshold inquiry. On the other side, two factors weigh against a violation. Based on that balance, the Court cannot say that the Kentucky Supreme Court unreasonably applied federal law by denying Bowling's claim. *See Brown v. Bobby*, 656 F.3d 325, 337 (6th Cir. 2011) (holding that a state court's denial of a defendant's speedy trial claim was not an unreasonable application of federal law when the first and third *Barker* factors favored a speedy trial violation and the second and fourth did not); *cf. United States v. Love*, 178 F.3d

1297, 1999 WL 115523, at *6-8 (6th Cir. Feb. 8, 1999) (finding no speedy trial violation when the first three *Barker* factors weighed in favor of the defendant, but the defendant did not show prejudice). As a result, the Kentucky Supreme Court reasonably applied *Barker*, and Bowling is not entitled to relief on this claim.

B.   *Denial of Motions To Continue Trial (Claim 28)*

Bowling's trial was scheduled to begin on Monday, September 21, 1992. On Friday, September 18, Bowling asked for a continuance. *See* 4 T.R. 593-94. He claimed that publicity in the *London Sentinel-Echo* had prejudiced him, *id.* at 593, and that the prosecution had just turned over a piece of evidence earlier that day—a picture of Bowling in his trailer's kitchen with a revolver in the background, 4 T.E. 568-69. The trial court denied that motion, and the trial began three days later. Bowling now alleges that the denial of a continuance violated his right to due process. Because the Kentucky Supreme Court summarily denied this claim in Bowling's direct appeal, the § 2254(d)(1) standard of review applies. *See Bowling*, 942 S.W.2d at 307 (listing "denial of motions for continuance" as claim (p)); Claim 8, *supra* p. 23.

The denial of a defendant's motion to continue trial "amounts to a constitutional violation only if there is an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *United States v. King*, 127 F.3d 483, 486-87 (6th Cir. 1997) (internal quote marks omitted) (quoting *United States v. Gallo*, 763 F.2d 1504, 1523 (6th Cir. 1985)). On top of that, a defendant must also "show that the denial resulted in actual prejudice to his defense." *Id.* at 487 (quoting *Gallo*, 763 F.2d at 1523). "[N]o mechanical tests" decide whether a denial of a continuance violates due process; rather, "[t]he answer must be found in the circumstances present in every case, particularly in the

59

reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

Regardless of the merits of Bowling's motion to continue, he cannot show that he suffered prejudice from the denial. As Bowling himself argued in his speedy trial claim, *see* Claim 14, *supra* p. 49, several witnesses had trouble remembering facts because an unusually long time—more than three and a half years—passed between his arrest and his trial. That length of time may have caused the memories of witnesses to fade, but it would also have taxed the memories of potential jurors who read prior press accounts of the murders. *Cf. Skilling*, 130 S. Ct. at 2916 (finding that a four-year delay between the initial media coverage of the crime and the trial diminished whatever prejudicial effect the initial coverage might have had). The only recent publicity Bowling cited was a single story in the *London Sentinel-Echo*. 4 T.R. 593. That article focused on the fact that (much to the relief of Londoners) the trial would not interfere with the town's annual fried chicken festival. *Bowling Trial, Chicken Fest Won't Clash*, London Sentinel-Echo, Sept. 7, 1992, 4 T.R. at 565-66. Bowling's name may have been back in the news, but such a story could hardly have prejudiced him. The article discussed few details of the trial or the prosecution's case. *Id.* Instead, it focused on more mundane details, such as the effect of the trial on the availability of parking in downtown London. *Id.* As the Court already discussed, *see* Claim 1, *supra* p. 10, the trial court seated a fair and impartial jury. The trial court also admonished all of the prospective jurors not to read any press coverage of the case. *See* 5 T.E. 646, *id.* at

699-701.[5]  Because this pretrial publicity did not prejudice Bowling, the trial court also did not violate his due-process right by denying his motion to continue trial.

Bowling also cannot show he was prejudiced by the trial court's refusal to delay trial because of the late disclosure of the photograph.  The prosecutor received this photograph less than a week before trial, and he turned a copy over to Bowling three days before trial started.  4 T.E. 569-70.  The prejudicial effect of the photograph was also limited.  In the foreground, the picture showed Bowling crouching in the kitchen of his trailer.  Id. at 568.  In the background, a revolver was lying on the sink.  Id.  Bowling was not holding the revolver, nor was there any indication that this revolver was of the same caliber or type as the weapon used in the Smith and Hensley murders.  And notwithstanding the late disclosure, Bowling was able to present evidence rebutting the inference that Bowling owned the revolver.  He called his father Ledford Bowling as a witness, and Ledford testified that he owned the revolver shown in the picture.  22 T.E. 3236.  This testimony is a sign that Bowling's attorney was at least able to make some preparations between receiving the photograph and trial.  Because Bowling cannot show that he suffered prejudice as a result of the pretrial publicity or the late disclosure of the photograph, the trial court cannot have violated his constitutional rights by denying his motion to continue trial.  Consequently, this claim fails.

_____

[5] For example, the trial judge admonished the jurors not to read any local newspapers and told them that they would "survive not reading the local papers for a little while."  5 T.E. 699-700.  If jurors wished to read "state newspapers" like the *Lexington Herald*, the trial judge said they should have family members "censor" the paper for them to make sure they did not encounter any articles about Bowling's case.  Id. at 700.  He further admonished jurors not to listen to local radio stations, because "there will be some items [about the case] that will be on local radio."  Id. at 701.  If jurors drove to the courthouse, the trial judge instructed them to use their "tape player or disk player or whatever, play that" instead of the radio.  Id. And if friends or family asked jurors about the case, the trial judge told them to respond "don't discuss that with me . . . the Court has instructed me that I can't comment."  Id.

C.      *Denial of Motion To Continue Sentencing Hearing (Claim 31)*

The jury returned Bowling's penalty-phase verdict on October 9, 1992.  *See* 5 T.R.

738.  Nearly two months later, on December 4, 1992, the trial court held a formal sentencing

hearing to impose judgment.  *Id*. at 739.  Immediately before that hearing, Bowling moved

for a continuance.  25 T.E. 3798.  As grounds, Bowling explained that he wished to present

newly discovered evidence.  *Id.*  Just that morning, Bowling's counsel spoke to someone at

the Laurel County jail about new evidence, but Bowling had not yet had the chance to

investigate that lead.  *Id*.  The trial court denied the motion and proceeded to sentence

Bowling, *id*. at 3799, a decision that the Kentucky Supreme Court summarily affirmed, *see*

*Bowling*, 942 S.W.2d at 307 (listing "denials of motions for continuance" as claim (p)).

As the Court explained in Claim 28, *supra* p. 59, the denial of a defendant's motion

for a continuance "amounts to a constitutional violation only if there is an unreasoning and

arbitrary insistence upon expeditiousness in the face of a justifiable request for delay."  *King*,

127 F.3d at 486-87 (internal quote marks omitted) (quoting *Gallo*, 763 F.2d at 1523).

Here, the trial court's denial of Bowling's motion to continue sentencing was

anything but unreasoning or arbitrary.  As a first matter, Bowling did not comply with the

requirements of Kentucky Rule of Criminal Procedure 9.04.  That rule allows a defendant to

postpone a hearing "on account of the absence of evidence," but only if he submits an

affidavit "showing the materiality of the evidence expected to be obtained, and that due

diligence has been used to obtain it."  Ky. R. Crim. P. 9.04.  Bowling asked for a continuance

on the cusp of his sentencing, and the only reason he gave was that he wanted to develop

new evidence.  He did not submit an affidavit, show that he would obtain material evidence

from further investigation, or show that he had been diligent in pursuing that evidence.

Indeed, he said nothing about what new evidence he hoped to discover.  25 T.E. 3798-99.

The trial judge thus complied with Kentucky procedural rules when he denied the motion

because Bowling had "not been fully able to develop and state" any new evidence.  *Id*. at

3799.  That denial was not a violation of Bowling's due-process rights.

In his reply, Bowling floats a last-ditch argument: that his trial counsel was

ineffective for failing to investigate the new evidence in advance of the sentencing hearing.

R. 159 at 182.  Bowling did not argue ineffective assistance in his original habeas petition,

*see* R. 1 at 159-62, so this argument is waived, *see Sailing v. Budget Rent-A-Car Sys., Inc.*,

672 F.3d 442, 444 (6th Cir. 2012) ("Arguments raised only in reply, and not in the original

pleadings, are not properly raised before the district court . . . ." (quoting *Travelers Prop.*

*Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 275 (6th Cir. 2010)).  Even if

Bowling were not barred from making this argument, he would be unsuccessful.  In order to

establish ineffective assistance of counsel, a defendant must show that his counsel's

representation fell below an objective standard of reasonableness and that the result of the

proceeding would have been different but for his counsel's errors.  *Strickland v. Washington*,

466 U.S. 668, 688, 694 (1984).  Nothing in the record indicates that Bowling's counsel could

have investigated the new evidence earlier or somehow failed to conduct a reasonable

investigation.  And without more information, the Court cannot speculate on how the

potential for new evidence would have changed the result of Bowling's sentencing.  *See*

*Strickland*, 466 U.S. at 695 (requiring that the reasonable probability of a different result

determination should be made based on "the totality of the evidence).  This claim fails.

## VI.     Testimony of Ora Lee Isaacs (Claims 17, 30)

### A.     *Release of Psychological Records (Claim 17)*

Shortly before the start of trial, Bowling's lawyer asked for a copy of Ora Lee Isaacs's psychological records.  4 T.E. 508.  Ora Lee Isaacs was married to Bowling when he was arrested, but she divorced him before trial.  21 T.E. 3192-93.  The records show that Isaacs suffered from depression and anxiety after experiencing a miscarriage and that she took prescription drugs to reduce her anxiety and help her sleep.  *See* 21 T.E. 3154-55. Bowling believes, among other things, that these records would have enabled him to prove that sleeping pills prevented Isaacs from knowing what time Bowling left their home the morning of the Hensley murder.  R. 1 at 122.  He also argues that the records would have shown that Issacs thought he was innocent.  *Id.*

The trial court did not grant Bowling's request.  Instead, the judge gave the parties an oral summary of the records and allowed them to ask questions about the records during a bench conference before Isaacs testified.  21 T.E. 3152-59.  Bowling now argues that the trial court's refusal to release Isaacs's psychological records violated his Sixth Amendment right to compel evidence in support of his defense.  R. 159 at 162-64 (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)).  The Kentucky Supreme Court summarily denied this claim on direct appeal.  *Bowling*, 942 S.W.2d at 307 (listing "refusal to release psychological records" as claim (i)).  Because of that summary denial, the standard of review outlined in § 2254(d)(1) applies.  *See* Claim 8, *supra* p. 23.

Nothing about the Kentucky Supreme Court's summary decision was contrary to clearly established federal law.  Bowling argues that denying him access to his ex-wife's psychological records was contrary to the rule established by *Pennsylvania v. Ritchie*, 480

U.S. 39 (1987).  *Ritchie* did note that other cases suggest the Sixth Amendment "may" require the government to "produce exculpatory evidence."  *Id*. at 56 (citing *United States v. Nixon*, 418 U.S. 683, 709, 711 (1974)).  But *Ritchie* also held that a "defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [government's] files" because the government has a "compelling interest" in preserving the confidentiality of sensitive information.  *Id*. at 59-60.  In *Ritchie*, that information was the identities of child abuse victims; in Bowling's case, it was Ora Lee Isaacs's personal medical records.  Instead, *Ritchie* explicitly stated that a defendant's right to a fair trial "can be protected fully" by a trial court's *in camera* review of the sensitive information.  *Id*.; *see also United States v. White*, 492 F.3d 380, 410 (6th Cir. 2007) (noting that *Ritchie* "did not hold that the government must give defense counsel unbridled access to [sensitive] information; only that the court be permitted to examine it").

Bowling's trial court did exactly that.  The judge reviewed Isaacs's psychological records, summarized their contents to the parties, and answered questions from Bowling's lawyer about details of the records.  In particular, the judge told Bowling's lawyer that Isaacs was not taking medications that could have impaired her sensory perceptions or memory on the nights of the murders.  21 T.E. 3156.  Federal constitutional law entitled Bowling to that *in camera* review, not the right "to conduct his own search" of his ex-wife's mental health records.  *Ritchie*, 480 U.S. at 59.  Accordingly, the Kentucky Supreme Court did not err when it upheld the trial court's decision, and Bowling is not entitled to relief on this claim.

> B.   *Isaacs's Testimony (Claim 30)*

At trial, Isaacs testified as part of the prosecution's case-in-chief.  On the stand, she said that her husband purchased a revolver from his uncle in Indiana.  21 T.E. 3197, 3200.

She further testified that the gun was kept on a rack in their home and identified pictures of their home showing the gun. *Id.* at 3197-99. When she was presented with the gun that police found near the Rockcastle Sunoco station—Commonwealth's Exhibit 16—she stated that it was Bowling's gun. *Id.* at 3197-98. In Claim 30, Bowling argues that this testimony was "rank speculation" because Isaacs lacked the expertise to identify the revolver the police recovered as the same one her husband owned. R. 1 at 158. As a first matter, state court evidentiary rulings are generally not cognizable in habeas. The only exception is if the evidentiary ruling was "so fundamentally unfair" that the resulting conviction violated the petitioner's due-process rights. *Henness v. Bagley*, 644 F.3d 308, 326 (6th Cir. 2011) (citing *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007)).

Kentucky law allows a lay witness to identify an object based on previous personal experience. *See* Ky. R. Evid. 901(b)(1) (listing "[t]estimony of [a] witness with knowledge" as a way to identify a piece of evidence); *see also Barth v. Commonwealth*, 80 S.W.3d 390, 402 (Ky. 2001) (admitting a victim's identification of a weapon that he found at scene of the offense and that was capable of inflicting the injury he suffered); *Beason v. Commonwealth*, 548 S.W.2d 835, 836-37 (Ky. 1977) (admitting eyewitness testimony that a gun was the same one used to commit the offense); *Sweatt v. Commonwealth*, 550 S.W.2d 520, 523 (Ky. 1977) (admitting eyewitness testimony that a gun was of the same type and shape as one used to commit the offense). The Federal Rules of Evidence are no different. *See* Fed. R. Evid. 901(b)(1) (listing "testimony of a witness with knowledge" as a way to identify a piece of evidence). The mere "possibility" of misidentification is not enough to make evidence inadmissible; rather, a trial court must only be sure to a "reasonable probability" that the

66

witness's identification is correct.  *United States v. Combs*, 369 F.3d 925, 938 (6th Cir. 2004).

Isaacs's testimony may not have been ironclad, but it was hardly a violation of due process.  She was with Ronnie Lee Bowling in Indiana when he bought the revolver, saw the revolver on a gun rack in their trailer, and took a picture of Bowling posing in front of the revolver.  21 T.E. at 3197-99.  That foundation might not have been enough for Isaacs to conclude definitively that the revolver the police found was the same one that belonged to Bowling, but it reduced the probability of misidentification.  And although Bowling alleges that Isaacs's testimony rendered his trial unfair, he does not explain *why* this one piece of testimony made his trial unfair.  A single evidentiary ruling rarely has such a dramatic effect.  *See, e.g.*, *Dowling v. United States*, 493 U.S. 342, 353 (1990) (holding that a trial court's admission of potentially prejudicial evidence did not make the entire trial unfair partially because "the jury . . . remained free to assess the truthfulness and the significance" of the challenged evidence and the defendant "had the opportunity to refute it").

Isaacs's testimony did not single-handedly transform Bowling's trial into a fundamentally unfair proceeding.  Bowling did not object to her testimony at trial, and he had the chance to challenge Isaacs about her identification of the revolver on cross-examination.  21-22 T.E. 3213-17.  He did not, choosing instead to call his father, Ledford Bowling, as a witness.  On the stand, Ledford claimed that the revolver was actually his.  22 T.E. 3236.  In this light, the decision to admit Isaacs's testimony did not render the entire trial so unfair as to violate Bowling's due-process rights.  He is therefore not entitled to relief on this claim.

## VII.   Burglary and Robbery Charges (Claims 5, 10, 25, 29)

### A.   *Directed Verdict on Burglary Charges (Claim 5)*

Bowling next claims that the Kentucky Supreme Court erred by failing to direct a not-guilty verdict on the two first-degree burglary charges.  In Kentucky, a person commits first-degree burglary when he "knowingly enters or remains unlawfully in a building" with "intent to commit a crime" and is "armed with explosives or a deadly weapon" or "causes physical injury to any person who is not a participant in the crime."  Ky. Rev. Stat. § 511.020(1).  But there is an exception: a person does not enter or unlawfully remain in a building that is "at the time open to the public" because, in that case, the person has a "license or privilege" to be there.  Ky. Rev. Stat. § 511.090(2).  The Kentucky Supreme Court, relying on *Tribbett v. Commonwealth*, 561 S.W.2d 662 (Ky. 1978), held that although Bowling may have had a license or privilege when he first entered the two gas stations, that license or privilege "terminated" when Bowling committed the murders.  *Bowling*, 942 S.W.2d at 307.  To put it mildly, murder was "an act inconsistent with the purposes of the business."  *Id.*

Bowling argues that he qualified for the burglary exception because there was no evidence that he remained in the gas stations after committing the murders, as opposed to leaving immediately.  R. 210 at 31-32.  He admits that his license to be in the stations expired when the murders occurred, *id*. at 32, but contends that he did not unlawfully linger after the murders, *id*. at 32-33.

The facts do not, however, support Bowling's argument.  The Kentucky Supreme Court held that there was ample evidence that "cash money was taken from the service stations and that Smith and Hensley were killed in conjunction with the taking of money."  *Bowling*, 942 S.W.2d at 307.  Based on that evidence, a jury could have found that Bowling

remained in the service stations after killing Hensley and Smith to take the money. And because Bowling's license expired, he was unlawfully in the service stations when he took money from their registers. That unlawful presence, combined with Bowling's intent to steal money, constituted a burglary under Kentucky Revised Statutes § 511.020. *See also Tribbett*, 561 S.W.2d at 664 (holding that a defendant "remained unlawfully upon the premises within the meaning of the burglary statute" when he remained in a murder victim's home to steal his property). The Kentucky Supreme Court did not violate due process when it ruled that there was sufficient evidence to support Bowling's burglary conviction.

In Bowling's eyes, this reading of the statute would produce an absurd result: "any murder committed in a public place open to the public would automatically also be a burglary." R. 210 at 32. But this argument focuses on the unlawful presence element of the burglary statute at the expense of the statute's second element—that the defendant also intended to commit a crime. If, after killing Marvin Hensley, Bowling sat down and started reading a newspaper at the service station, his presence would have been unlawful, but he would not be a burglar because he did not intend to commit a crime. Instead, when Bowling remained, he intended to steal. He then followed through on that intent by emptying the stations' registers.

This interpretation of the burglary statute also avoids any double jeopardy concerns. Bowling claims that the Kentucky Supreme Court's definition of burglary makes the crime a lesser-included offense of robbery, so he could not have been constitutionally convicted of both. R. 159 at 109-10. A defendant charged with two offenses is not placed in double jeopardy if each offense "requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932); *see also United States v. Dixon*, 509 U.S. 688, 696

(1993) ("The same-elements test, sometimes referred to as the "*Blockburger*" test, inquires whether each offense contains an element not contained in the other . . . ."). Under Kentucky law, a person commits robbery when he "uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft" and "causes physical injury to any person who is not a participant in the crime" or is "armed with a deadly weapon." Ky. Rev. Stat. § 515.020. Even if the criminal steals property after killing the victim, he still commits robbery "so long as the theft and the murder are part of the same criminal episode." *Bowling*, 942 S.W.2d at 307; *accord Williams*, 639 S.W.2d at 788.

Burglary and robbery are not merged offenses under Kentucky law. Robbery has an element that burglary does not—a robber must actually use or threaten the use of physical force, while a burglar need only intend to commit a crime. And burglary has an element that robbery does not—unlawfully entering or remaining in a building. If Bowling encountered Hensley and Smith while walking down the street, murdered them, and took their wallets, he would be guilty of murder and robbery. But because Bowling was not in a building when he committed those crimes, he would not be guilty of burglary. Similarly, if Bowling walked in to the gas stations, brandished a gun, and demanded money without harming Hensley and Smith, he would have committed robbery but not burglary because he did not remain in the gas stations after his license expired. Conversely, Bowling could be guilty of murder and burglary, but not robbery, if he broke in to the gas stations, killed Hensley and Smith, and then spray-painted graffiti on the walls.

In this case the jury found that Bowling entered the gas stations, killed the attendants, and then remained on the premises with the intent to commit a crime. At that point, he had committed burglary. When Bowling took money from the registers, he used force to

70

accomplish a theft.  That action constituted robbery.  Because burglary required a separate element from robbery—unlawful presence—it was not a lesser included offense.

Finally, the Kentucky Supreme Court's interpretation of the burglary statute did not violate the Constitution's Ex Post Facto Clause.  Article I provides only that "[n]o State shall . . . pass any . . . ex post facto law."  U.S. Const., art. I, § 10, cl. 1.  The Supreme Court has long interpreted that language to prohibit "[e]very law that makes an action done before the passing of the law, and which was innocent when done, criminal."  *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798) (opinion of Chase, J.).  By its own terms, the clause "is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government."  *Marks v. United States*, 430 U.S. 188, 191 (1977) (internal citations omitted).  Nevertheless, due process "bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision had fairly disclosed to be within its scope."  *United States v. Lanier*, 520 U.S. 259, 266 (1997); *see also Marks*, 430 U.S. at 191-92 (noting that due process requires that citizens "have a right to fair warning of that conduct which will give rise to criminal penalties").

In Bowling's direct appeal, the Kentucky Supreme Court applied *Tribbett v. Commonwealth*, a 1978 decision, to conclude that Bowling "terminated his license to be on the premises" when he committed the murders.  *Bowling*, 942 S.W.2d at 307.  To Bowling, this application was an "unforeseeable and retroactive judicial expansion" of burglary because *Tribbett* dealt with a criminal who killed the victim inside his own home, rather than in a public place.  R. 159 at 110.  But nothing in the *Tribbett* opinion limited that decision's analysis to crimes committed inside the home.  Rather, *Tribbett* held that "[u]pon the death of the licensor, the license ceased and the privilege to be upon the premises lapsed."  561

S.W.2d at 664. To support that statement, the *Tribbett* court cited three treatises, each written more than twenty years before Bowling was arrested. *Id.* (citing 3 Herbert T. Tiffany & Basil Jones, Real Property § 836 (3d ed. 1939); 53 C.J.S. Licenses § 87 (1948); 25 Am. Jur. 2d Easements and Licenses § 131 (1966)). After *Tribbett*, future defendants were on notice that committing a murder would extinguish their license to be on private property and make them guilty of burglary. Whether that private property was a residence or a business "open to the public" within the exception of Ky. Rev. Stat. § 511.090(2) was immaterial. As a result, Bowling suffered no due-process violation and he is not entitled to relief on this claim.

> **B.**    *Directed Verdict on Aggravating Circumstances of Burglary and Robbery (Claim 10)*

Bowling also argues that he should have received a directed verdict on the aggravating circumstances of burglary and robbery. R. 1 at 104-05; R. 159 at 135-39. As the Court explained in Claim 5, *supra* p. 68, Bowling was not entitled to a directed verdict on the burglary or robbery charges against him. For those same reasons, he was also not entitled to a directed verdict on those offenses as aggravating circumstances.

But Bowling raises one new argument in Claim 10. He claims that the Kentucky Supreme Court's interpretation of the state's burglary statute would have the effect of allowing "almost all, if not all, murders involving a weapon to be a death penalty offense as long as the murder occurs outside the perpetrator's home." R. 159 at 137. This broad definition of burglary would, in Bowling's eyes, fail to "sufficiently narrow the class of individuals eligible for the death penalty as required by the Eighth Amendment." *Id.* (citing *Zant v. Stephens*, 462 U.S. 862, 877 (1983)).

This argument misunderstands the Kentucky Supreme Court's definition of burglary. Not all murderers are burglars in Kentucky; only murderers who remain on private property after killing with the intention of committing another crime. As the Court previously explained, Bowling committed burglaries because after the murders, he unlawfully remained in the service stations with the intention to commit another crime. Claim 5, *supra* p. 68. That crime was theft. *Id.* If Bowling had remained in the gas stations with lawful intentions—for instance, the intent to read the newspaper—he would not have committed burglary. Likewise, if Bowling had immediately left the stations without taking any money, he would not have committed burglary. Not all murders committed outside the home involve unlawfully remaining on private property with the intent to commit *another* crime. Some murderers flee the scene of the crime immediately, and others intend nothing more than to harm their victim. The aggravating factor of burglary thus served to narrow the category of murderers eligible for the death penalty. *See Lowenfield*, 484 U.S. at 244-46 (upholding Louisiana's use of burglary as a statutory aggravating factor for the death penalty). As a result, Bowling did not suffer a violation of his Eighth Amendment rights, and he is not entitled to relief on this claim.

C.     *Directed Verdict on Robbery Charges (Claim 25)*

As the Court explained in Claim 5, *supra* p. 68, and Claim 10, *supra* p. 70, the prosecution put forward sufficient evidence to support the jury's conviction of Bowling on counts of murder, burglary, and robbery, and the jury's decision to find aggravating circumstances of robbery and burglary. For those same reasons, the Kentucky Supreme Court did not violate federal law when it denied Bowling's claim that he should have received a directed verdict on the two robbery counts.

D.      *Multiple Punishments (Claim 29)*

The Kentucky Supreme Court also summarily denied Bowling's claim that his convictions for murder, robbery, and burglary were multiple punishments for the same offense.  *Bowling*, 942 S.W.2d at 307 (claim (q)).  In Claim 5, the court explained that Bowling's convictions for burglary and robbery did not place him in double jeopardy because the statutory definitions of burglary and robbery contained different elements.  *See supra* p. 68.  The Kentucky Supreme Court also did not act contrary to clearly established federal law when it ruled that Bowling's convictions for murder and robbery and for murder and burglary did not violate the Double Jeopardy Clause.

Bowling contends that his murder and robbery offenses merged because the indictment "relied on" shooting and killing Smith and Hensley "as the aggravating factor[s] which elevated the crime[s] to Robbery First Degree."  R. 1 at 154.  As an initial matter, Bowling's argument misstates double jeopardy by focusing on the proof required to convict him, rather than the statutory elements of the offenses.   In the context of multiple punishments in a single prosecution, the Double Jeopardy Clause "does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983).  The traditional test of *Blockburger v. United States*, 284 U.S. 299, 304 (1932), is therefore a "rule of statutory construction," *Hunter*, 459 U.S. at 366, that "focuses on the statutory elements of the two crimes with which a defendant has been charged, not on the proof that is offered or relied upon to secure a conviction," *Grady v. Corbin*, 495 U.S. 508, 528 (1990) (Scalia, J., dissenting), *overruled by United States v. Dixon*, 509 U.S. 688, 704 (1993)).  The statutes' definitions of the elements of the two offenses, not similarity in proof, determine whether a defendant has been placed in

double jeopardy.  *See, e.g.*, *Dixon*, 509 U.S. at 701-02 (looking to statutory language, rather than the defendant's conduct, to decide whether multiple counts violated the Double Jeopardy Clause).

In Kentucky, a person commits first-degree robbery when he "uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft" and "causes physical injury to any person who is not a participant in the crime" or is "armed with a deadly weapon" Ky. Rev. Stat. § 515.020(1).  Murder, by contrast, requires a defendant to intentionally cause the death of another person.  Ky. Rev. Stat. § 507.020(1).  Robbery requires an element that murder does not (intent to steal) and murder contains an element that robbery does not (causing death).  The two offenses are not merged for double jeopardy.

Bowling nevertheless argues that "the Commonwealth had to prove all the conduct necessary to constitute the Murder in order to prove [he] committed Robbery [in] First Degree."  R. 1 at 155.  That may be so, but similarities in the proof of multiple offenses in the same prosecution have never implicated Double Jeopardy.  *See Grady*, 495 U.S. at 516-17 (declining to expand Double Jeopardy to include similar proof of conduct when the defendant is prosecuted for multiple offenses in the same prosecution).  Bowling's argument again conflates the statutory elements of a crime with a defendant's conduct.  Bowling could have easily committed robbery without murder if he had held up Hensley and Smith but not shot them.  Likewise, he could have committed murder without robbery if he had shot Hensley and Smith without taking money.  Bowling's robbery and murder convictions therefore did not violate double jeopardy.

For the same reasons, Bowling's convictions for burglary and murder did not violate the Double Jeopardy Clause.  Burglary requires unlawful presence in a building, Ky. Rev.

Stat. § 511.020(1), but murder does not.  And murder requires killing another person, which burglary does not.  Because each offense has a statutory element that the other lacks, Bowling was not subject to multiple punishments for the same offense.

## VIII.   Evidentiary Objections (Claims 21, 22, 23)

Bowling's next three claims are a laundry list of objections to allegedly improper evidence and arguments that the prosecution presented at his trial.  He believes that the prosecution introduced: (1) improper rebuttal testimony from several witnesses, R. 1 at 133-35; (2) potentially prejudicial character evidence, R. 1. at 135-38; and (3) various hearsay testimony, R. 1 at 138-42.

Bowling faces an uphill climb on these claims for two reasons.  First, the Kentucky Supreme Court summarily denied all three claims in Bowling's direct appeal.  *See Bowling*, 942 S.W.2d at 307 (listing Bowling's improper rebuttal evidence, criminal disposition evidence, and inadmissible evidence as claims (j), (k), and (*l*).  The § 2254(d)(1) standard of review therefore applies.  *See* Claim 8, *supra* p. 23 (citing *Harrington*, 131 S. Ct. at 784).  Second, state court evidentiary rulings are generally not cognizable in habeas unless they were "so fundamentally unfair" that they violated the petitioner's due-process rights. *Henness*, 644 F.3d at 326 (citing *Bey*, 500 F.3d at 519-20).  None of these claims meet that "very narrowly" drawn standard, *Dowling*, 493 U.S. at 352, so Bowling is not entitled to relief.

### A.    Rebuttal Evidence (Claim 21)

Bowling believes that the trial court violated his right to a fair trial by allowing the prosecution to call several rebuttal witnesses.  R. 1 at 133-35.  Specifically, the prosecution called: Bowling's father, Ledford Bowling; his ex-wife, Ora Lee Isaacs; the Lee County

Sheriff, Douglas Brandenburg; and Claude Martin.  Kentucky law allows the prosecution to present rebuttal evidence that contradicts the defendant's assertions or impeaches the credibility of his witnesses.  *See, e.g.*, *Peters v. Commonwealth*, 345 S.W.3d 838, 844 (Ky. 2011).  Rebuttal in Bowling's trial followed that mold: Ledford Bowling and Sheriff Brandenburg impeached the credibility of defense witnesses, *see* 23 T.E. 3442-43, 3506-07, and Isaacs rebutted Ledford Bowling's testimony that he owned the gun found in Ronnie Lee Bowling's trailer, *id*. at 3451-52.  And even if this testimony should have been presented in the prosecution's case-in-chief, Bowling has not put forward any authorities for the proposition that improper rebuttal testimony rises to the level of a constitutional violation.  *Cf. Henderson v. Norris*, 118 F.3d 1283, 1286 (8th Cir. 1997) (rejecting a habeas petitioner's claim that he was denied a fundamentally fair trial when the prosecution presented testimony in rebuttal instead of in its case-in-chief).  Bowling has also not claimed he was ambushed by these rebuttal witnesses.  *See id.* at 1286-87 (reasoning that "unfair surprise" might be grounds on which rebuttal testimony might be fundamentally unfair).  Indeed, he could hardly have been surprised by two of them: Ledford Bowling and Ora Lee Isaacs testified in the prosecution's case-in-chief, and Bowling called his father as part of his own case-in-chief.  Nothing about the prosecution's rebuttal witnesses made Bowling's trial fundamentally unfair.

     B.    *Character Evidence (Claim 22)*

Bowling also contends that the prosecution introduced improper evidence about his character.  In particular, he faults the prosecution's introduction of evidence that he owned a sawed-off shotgun, that he received food stamps, and that did not allow his wife to leave their trailer.  R. 1 at 135-38.

This evidence did not violate Bowling's constitutional rights. The prosecution introduced evidence of Bowling's shotgun to counter his claim that he only owned a .22-caliber rifle. Admittedly, the prosecution's presentation of this evidence was less than perfect. The trial court instructed the prosecution to tell its witnesses not to describe the shotgun as "sawed-off," 18 T.E. 2719, but Kentucky State Trooper Gerald Schenkenfelder said he found a ".410 shotgun; sawed-off" in Bowling's trailer, 19 T.E. 2860. The trial court immediately limited the prejudicial impact of that misstatement by telling the jury to "disregard" the condition of the shotgun and "not consider [it] at all as evidence in this case." 19 T.E. 2861; *see United States v. Layne*, 192 F.3d 556, 573 (6th Cir. 1999) (holding that "the giving of a curative instruction by the trial court" can "render harmless the erroneous admission of prejudicial evidence").

The other character evidence in dispute also had probative value. The prosecution offered evidence that Bowling received food stamps to prove that Bowling had a motive to take money from the gas station registers. *See* R. 114 at 99-100. Similarly, Bowling's refusal to let his wife leave their trailer for work might also have contributed to his need for money. Under Kentucky Rule of Evidence 404(b), the trial court had the authority to admit propensity evidence offered for a purpose other than proving character, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." That is exactly what the trial court appears to have done. There is, of course, a possibility that the trial court misconstrued Kentucky's rules of evidence. But the Court cannot grant habeas relief based on its disagreement with "state-court determinations of state-law questions," *Estelle v. McGuire*, 502 U.S. 62, 68 (1991), unless the state court's ruling was so "fundamentally unfair" that it deprived Bowling of due process, *Bey*, 500 F.3d

at 519-20.  Bowling has not shown any fundamental unfairness.  Rather, he merely disagrees with the trial court's calculus of the probative weight and prejudicial effect of the prosecution's evidence.  This "personal disagreement" is not enough to establish a constitutional violation.  *Id*. at 523.

C.      *Hearsay Testimony and Other Evidentiary Rulings (Claim 23)*

Bowling also believes that the trial court allowed the prosecution to present other evidence that should have been inadmissible.  R. 1 at 138-42.  Specifically, he believes that the trial court erroneously allowed: hearsay evidence about Marvin Hensley's character; hearsay about Ledford Bowling's statements to his wife about the .38-caliber revolver police found in Bowling's trailer; the impeachment of Ledford Bowling on that same issue; and prejudicial testimony that Bowling lied to his wife about his affair with April Lunsford.  These evidentiary rulings were also all based on the Kentucky Rules of Evidence.

And the decisions may have been correct.  Even a brief review of the record shows that the statements Bowling cites could justifiably be admitted under well-established principles of evidence law.  Hearsay about Ledford Bowling may have been admissible as prior inconsistent statements.  23 T.E. 3457-58.  Bowling's relationship with Lunsford— which provided his alibi for the Hensley murder—may have also had probative value substantially greater than the prejudicial effect of evidence that he lied to his wife.  22 T.E. 3320-21.  But regardless of whether the evidence was admissible, a federal habeas court cannot grant relief unless a state court's evidentiary rulings were so "fundamentally unfair" as to violate due process.  *Bey*, 500 F.3d at 519-20.  The Supreme Court has also repeatedly emphasized that this standard creates an extremely high bar for a bare due-process objection to admitted evidence.  *See, e.g., Perry v. New Hampshire*, 132 S. Ct. 716, 723 (2012) (citing

*Napue v. Illinois*, 360 U.S. 264, 269 (1959)).   Bowling claims the rulings violated "fundamental fairness," R. 1 at 142, but he has not argued *why* the decisions were so unfair. As a result, this claim fails.

## IX.   Prosecutorial Misconduct (Claims 24, 32, 34)

### A.   *Guilt Phase Closing Argument (Claim 24)*

In addition to his evidentiary objections, Bowling also argues that the prosecutor's closing argument was improper.   According to Bowling, the prosecutor implied that the judge and jury were working to find Bowling guilty; referred to a juror by name; used the phrase "God's earth" when discussing the murder of Marvin Hensley, a preacher; commented on Bowling's failure to call Timothy Chappell's attorney as a witness; described one of Bowling's theories as a "red herring"; and referred to Kentucky State Police examiner Jeffrey Scott Doyle as a defense expert witness.   R. 1 at 142-46.   Like state-court evidentiary rulings, a prosecutor's improper comments only violate the Constitution if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker*, 2012 WL 2076341, at *5 (quoting *Darden*, 477 U.S. at 181).   This standard is a "very general one" that gives courts considerable leeway.   *Id.* at *6 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also id.* (noting that *Darden* held that an "inflammatory" closing argument did not merit habeas relief, even when the prosecutor called  the defendant an "animal" and said he would like to see the defendant "with no face, blown away by a shotgun").   Prior to *Parker*, the Sixth Circuit evaluated prosecutorial misconduct claims under a four-factor test: (1) whether the statement tended to mislead the jury and prejudice the defendant; (2) whether the improper statements were isolated or pervasive; (3) whether the prosecutor deliberately made improper statements in front of the

jury; and (4) whether the evidence against the accused is otherwise strong. *Galloway*, 316 F.3d at 632 (citing *Francis*, 170 F.3d at 549); *Carroll*, 26 F.3d at 1387. Although the Supreme Court questioned the vitality of the Sixth Circuit's "elaborate, multistep" test on habeas review, *Parker*, 2012 WL 2076341 at *6, even these factors do not support Bowling's claims.

First, the prosecutor's closing argument did not claim that the judge and jury should work to find Bowling guilty. Instead, he said that "[t]he bailiffs are near the completion of their work, the judge is near completion, and we're near completion; and the work now falls to you to continue on with the work of determining the guilt of Ronnie Bowling." 24 T.E. 3565. This statement accurately conveyed the state of the trial. The judge had almost finished presiding over the trial, and the jury was about to determine whether Bowling was guilty. Bowling did not suffer any prejudice from that comment because it did not mislead the jurors as to the law or their responsibilities. *Cf. Caldwell*, 472 U.S. at 328-29 (holding that closing argument is improper when it leads jurors to "believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere").

Similarly, the prosecutor was not out of line when he pointed out that Bowling did not call a witness who might have provided exculpatory evidence. A defendant's privilege against self-incrimination applies only to his own decision to testify. *See Lockett*, 438 U.S. at 595. As a result, "the prosecutor may imply that the failure of the defense to present available evidence (other than the defendant's testimony) in opposition to the government's witnesses supports a conclusion that the government's witnesses are reliable." *United States v. Sblendorio*, 830 F.2d 1382, 1392 (7th Cir. 1987). The prosecutor's argument about a witness whom Bowling could have but did not call simply asked the jury "to assess the value

of the existing evidence in light of the countermeasures that were (or were not) taken." *Id.* at 1391.  Moreover, the prosecutor made his comments in response to the defense counsel's suggestion that Timothy Chappell's testimony against Bowling was not credible because Chappell had cut a deal with prosecutors.  *See* 24 T.E. 3558-60 (defense closing argument that Chappell "felt like he had to make sure he got something" so he "wouldn't have to worry about going to the penitentiary for twenty years").  Thus, the prosecutor's comment—that Bowling could have, but did not, call Chappell's attorney to support his theory that Chappell lied—was "a fair response to a claim made by defendant or his counsel."  *United States v. Robinson*, 485 U.S. 25, 32 (1988).

The prosecutor's other comments were also not prejudicial.  His description of the world as "God's earth," reference to one juror by name, and use of the phrase "red herring" may have been improper.  *See* 24 T.E. 3567.  But these comments were all "isolated passages" of the closing argument, unlikely to cause prejudice because they were "billed in advance to the jury as a matter of opinion not of evidence," *Donnelly*, 416 U.S. at 646.  There is also no evidence that these statements were deliberate attempts to prejudice the jury rather than unintentional gaffes.  *See Carroll*, 26 F.3d at 1389-90 (finding that a prosecutor's isolated remark was not deliberate when there was no evidence to the contrary).  And as the Court has already explained, the prosecutor's statements about Doyle did not violate due process.  *See* Claim 8, *supra* p. 23.  None of the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Parker*, 2012 WL 2076341, at *5 (quoting *Darden*, 477 U.S. at 181), so Bowling is not entitled to relief on this claim.

B.      *Penalty Phase (Claims 32 and 34)*

Bowling also believes that prosecutorial misconduct violated his constitutional rights by rendering his mitigation evidence "meaningless." R. 1 at 162. The Kentucky Supreme Court summarily denied this claim, *Bowling*, 942 S.W.2d at 307 (listing "improper closing argument" and "denigration of mitigation" as claims (m) and (r)), so the § 2254(d)(1) standard of review applies. As just discussed, a prosecutor's improper comments violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker*, 2012 WL 2076341, at *5 (quoting *Darden*, 477 U.S. at 181).

As an initial matter, Bowling contests several statements by the prosecutor that were entirely proper. In his penalty-phase closing argument, for instance, the prosecutor told the jury that life without parole for twenty-five years was the second-greatest punishment they could give Bowling. 25 T.E. 3753-55. This statement was not inappropriate. A prosecutor may tell the sentencing jury in a capital case that the defendant could eventually receive parole because "it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not." *Simmons v. South Carolina*, 512 U.S. 154, 163 (1994). Nothing is improper about giving the jury accurate information about its sentencing choices. *Bedford v. Collins*, 567 F.3d 225, 235 (6th Cir. 2009) ("So long as the jury receives accurate information, it may consider the possibility, speculative though it may be, that future decisions of state executive officials could lead to the defendant's early release." (citing *California v. Ramos*, 463 U.S. 992, 1001-03 (1983))).

The prosecutor also did not err when he opined that a death sentence for Bowling would not make holidays more bearable for Smith and Hensley's families.  25 T.E. 3759. "[J]ust as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (quoting *Booth v. Maryland*, 482 U.S. 496, 517 (1987) (White, J., dissenting)).  In *Payne*, the Supreme Court held that a prosecutor did not engage in misconduct when he told the jury "there is nothing you can do to ease the pain" of the victim's family and that the victim's three-year-old son would never have a mother to "kiss him good night or pat him as he goes off to bed, or hold him and sing him a lullaby." *Id*. at 815-16.  Under that standard, the prosecutor's argument in this case—that Smith and Hensley's families would struggle during Christmas, Easter, and birthdays without them— was not misconduct.

Some of the other remarks that Bowling challenges were not improper when considered in context.  For instance, in voir dire, the prosecutor asked potential jurors if they might sympathize with a defendant based on his "age or appearance" because someone in their family was of a similar age or appearance.  17 T.E. 2490.  That question relates to a juror's ability to consider a case fairly, not the presence of a mitigating factor.  *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (holding that jurors may be questioned in voir dire and challenged for cause where their "views would prevent or substantially impair the performance of [their] duties as a juror in accordance with [their] instructions and oath" (quotation omitted)).

Similarly, Bowling alleges that the prosecutor engaged in misconduct by asking the Rockcastle County jailer and Clay Circuit Court clerk about the limits of their knowledge of

84

Bowling's criminal history.  On direct examination, the jailer testified that Bowling had not had any discipline problems while in the Rockcastle County jail, 25 T.E. 3730-31, and the clerk testified that Bowling had not been involved in any domestic violence incidents, 24 T.E. 3655.  In response to that testimony, the prosecutor clarified that the jailer had no knowledge of Bowling's "conduct . . . in other jails," 25 T.E. 3731,[6] and that the Clerk's Office did not keep domestic violence records prior to 1989, 24 T.E. 3655-56.  Rebutting direct testimony and testing the limits of a witness's knowledge are the basic purposes of cross-examination.  *See, e.g.*, Fed. R. Evid. 611(b); Francis Lewis Wellman, <u>The Art of Cross-Examination</u> 40 (1903) ("[I]f the jury only knew the scanty means the witness has had for obtaining a correct and certain knowledge of the very facts to which he has sworn so glibly, aided by the adroit questioning of the opposing counsel, this in itself would go far toward weakening the effect of his testimony.").  The prosecutor did not commit a constitutional violation simply by engaging in proper cross-examination of Bowling's penalty-phase witnesses.

Other statements in the prosecutor's penalty phase closing argument also were not improper.  Yes, the prosecutor commented on Bowling's young age.  But he accurately told the jury that Bowling's youth was a mitigating factor.  25 T.E. 3754-55.  A prosecutor may discuss relevant mitigating factors in his closing argument.  *See Buell*, 274 F.3d at 364 (holding that prosecutors who "argued that the mitigating factors did not outweigh the aggravating circumstances" were "simply doing their job").  Here, the trial court instructed the jury to consider only the evidence presented during the trial and that Bowling's age was

---

[6] Bowling was also detained in the Laurel County and Clay County jails before trial.  *See* 3 T.R. 318.

potentially a mitigating factor.  25 T.E. 3745.  Throughout the closing, the prosecutor argued that Bowling's youth did not excuse his actions.  *See, e.g.*, *id*. at 3757 ("What is there in his youth that would . . . mitigate him, for executing two people?"); *id*. at 3758 ("It was [Bowling's] decision, in looking at that young man right there, to render him in that condition.  What can mitigate that?"); *id*. ("That is the sign of the execution that Ronnie Bowling selected for these people.  What can mitigate that?").  These are the routine arguments of a prosecutor doing his job by countering the defendant's mitigation theory.

The prosecutor also told the jury that "perhaps it's best said by his cousin; 'something went wrong'" in Bowling's life.  *Id*. at 3757.  The prosecutor's next sentence—that "we don't know" what went wrong—is naturally interpreted as an observation based on the testimony of Bowling's cousin.  Only under the most tortured of readings would that statement pass as veiled commentary on Bowling's decision not to testify.

Finally, Bowling argues that the prosecutor's use of photographs of the dead bodies of Smith and Hensley crossed the line into misconduct.  Showing photographs of the victim is not uncommon at the penalty phase of a trial.  *See, e.g.*, *Payne*, 501 U.S. at 825 (describing how the State is entitled to "the full moral force of its evidence").  Moreover, the jury had already seen these photographs during the guilt phase of the trial, and several of the photographs did not show any blood.  *See* 25 T.E. 3740-41 (describing the photographs as "previous evidence" that were admitted in the guilt phase); 17 T.E. 2596 (noting that one photograph of Smith "shows no blood whatsoever," two others showed "a small amount of blood," and one photograph of Hensley "shows no blood").  Only "excessive" or unfairly "prejudicial" victim impact evidence can violate due process.  *Beuke v. Houk*, 537 F.3d 618, 648 (6th Cir. 2008) (citing *Roe v. Baker*, 316 F.3d 557, 565-66 (6th Cir. 2002); *see also*

*Payne*, 501 U.S. at 825 ("In the event [victim-impact] evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due-Process Clause of the Fourteenth Amendment provides a mechanism for relief.").  The photographs showed the extent of Smith and Hensley's injuries and the location of their bodies near each gas station's cash register.  *See* 18 T.E. 2603-04, 2610-11.  Those facts supported the aggravating factors the prosecution sought to prove in the penalty phase: that Bowling committed multiple, intentional murders and that he committed those murders while carrying out robberies and burglaries.  *See Bedford*, 567 F.3d at 235 (holding that photographs of murder victims were not prejudicial when the photographs were relevant to a statutory aggravating factor).  In short, the photographs did not so unfairly infect Bowling's penalty phase as to make Bowling's sentence a denial of due process.

Because none of the prosecutor's statements violated Bowling's constitutional rights, the Kentucky Supreme Court's rejection of this claim was not contrary to clearly established federal law.  Consequently, Bowling is not entitled to relief on Claims 32 or 34.

## X.    Ineffective Assistance of Counsel (Claims 49, 65)

### A.    *Failure To Investigate and Prepare Edward Eugene Herren (Claim 49)*

At trial, Bowling attempted to create reasonable doubt by presenting several theories about other possible killers.  *See, e.g.*, 18 T.E. 2701-11 (defense cross-examination of David Gross revealing that Hensley had refused to give money to an unidentified young man in a pickup truck); 22 T.E. 3344-47 (testimony of defense witness Philip Johnson that two "rough[-] looking guys" visited Hensley's station several days before he was killed); 24 T.E. 3526-28 (defense closing argument suggesting that Daniel Howe, an employee of the Jones Chevron, may have been responsible for Smith's death).  One of these alternate theories

involved testimony from Edward Eugene Herren, a newspaper deliveryman. Herren delivered the *Corbin Times-Tribune* to the Chevron station where Ronnie Smith worked. 22 T.E. 3330-31. The day before Smith was killed, Herren overheard two men talking in the gas station's bathroom. He recalled that one man looked at the gas station attendant, then said to the other, "[T]hat M.F. is fried" while forming his fingers into the shape of a gun. *Id*. at 3331. Herren also was certain that neither of the two men was Bowling. *Id*. at 3332. On cross-examination, however, the prosecution confused Herren about the date this incident occurred. Based on a police report, Herren admitted that he heard the men in the bathroom the afternoon after Smith was killed. *Id*. at 3333-35. But Bowling argues that the police report was erroneous. R. 1 at 239. At a postconviction hearing in 1998, Herren testified that he heard the threats the afternoon *before* Smith was killed. *See id*. at 240 (citing Rule 11.42 Hr'g Video, Disc 1, 16:15:44-16:16:38). If the report had been correct, Bowling believes the prosecution would have been unable to impeach Herren.

In Bowling's eyes, his trial counsel was constitutionally ineffective by failing to prepare Herren sufficiently for trial. At the postconviction hearing nine years after the trial, Bowling's trial counsel testified that he did not recall whether he or his colleagues met with Herren. *See* Rule 11.42 Hr'g Video, Disc 3, 21:08:03-09 ("But whether we went out or I went out and talked to him, I can't remember."). When he reviewed the police report with the incorrect date, Bowling's lawyer recalled that the police had already taken a statement from Herren. Bowling's lawyer thus believed that if he interviewed Herren again, he would have received the same statement contained in the report. *Id*. at 21:08:48-54 ("I can't remember if I sent an investigator out because—he already—it looks like somebody had already taken his statement . . . .").

To succeed on an ineffective assistance claim, Bowling must show that his counsel's performance was deficient and that he suffered prejudice as a result. *Strickland*, 466 U.S. at 687. This standard is demanding. Courts "strongly" presume that defense lawyers "have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. And to show prejudice, a defendant must demonstrate that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

In Bowling's postconviction proceeding, the Laurel Circuit Court found that Bowling's lawyer discussed Herren's testimony with him before trial, and thus held that Bowling's counsel performed effectively in preparing Herren. 6 T.R. for Rule 11.42 Appeal 768. This conclusion was at least plausible: Bowling's lawyer would have had little reason to call Herren based solely on a police report that indicated Herren heard the threat the day after Smith's murder. And even if Bowling's lawyer did not interview Herren, the Kentucky Supreme Court held that a failure to interview "could not rise to the level of ineffective assistance" under *Strickland*. *Bowling v. Commonwealth*, 80 S.W.3d 405, 417 (Ky. 2002). As a result, Bowling can only succeed on this claim by showing that the Kentucky Supreme Court unreasonably applied *Strickland* to his claim. 28 U.S.C. § 2254(d)(1). The U.S. Supreme Court has explained that this review is "doubly deferential": the Court must conduct a "highly deferential" evaluation of Bowling's lawyer through the "deferential lens" of § 2254(d). *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 689; *Mirzayance v. Knowles*, 556 U.S. 111, 121 n.2 (2009)).

Here, Bowling has not overcome that double deference on the deficient-performance prong of *Strickland*. A defense lawyer does not inherently act outside the realm of

"reasonable professional judgment," *Strickland*, 466 U.S at 690, by relying on a witness's statement in a police report. Herren's testimony was a relatively minor part of Bowling's defense, and Bowling presented no other evidence linking the men in the restroom to Smith's murder. In fact, there was no evidence that the men planned to kill anyone, or were even talking about the gas station attendant. With limited time and resources before trial, Bowling chose instead to advance several other theories about who could have killed Smith and Hensley. In that light, not investigating further could have been sound strategic judgment rather than deficient performance. *See Strickland*, 466 U.S. at 691 (holding that a defense "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2011) (stating that "any limitation on counsel's investigation must be supported by a reasonable professional judgment" (internal quotation omitted)). The Kentucky Supreme Court thus could have reasonably concluded that Bowling did not rebut the strong presumption of competence mandated by *Strickland*. As a result, this claim fails.

### B.   *Failure To Object to Evidence of Rockcastle County Shooting (Claim 65)*

Before trial began, Bowling's attorney filed a motion in limine to exclude all evidence of the Rockcastle County shooting as impermissible character evidence. 4 T.R. 544-48. The trial court denied the motion, and the prosecutor introduced evidence of the shooting at trial. The prosecutor then discussed the shooting in his closing argument for the guilt phase. He asked the jury whether it was credible that Bowling would drive more than forty miles from his home "to stand around in the early morning hours, looking for a job" at the Rockcastle Sunoco. 24 T.E. 3584-85. He also told the jury that the Rockcastle shooting "tie[d] together"

with the Smith and Hensley shootings and that Bowling was the man at "the center" of all three incidents. *Id*. at 3589-90.

Bowling now argues that his trial counsel was ineffective for failing to object to the prosecutor's closing argument statements about the Rockcastle shooting. R. 1 at 301-04; R. 159 at 277-80. As the Court explained in Claim 49, a habeas petitioner can only succeed on an ineffective assistance claim if he shows his lawyer's performance was deficient and that he suffered prejudice as a result. *See supra* p. 87 (citing *Strickland*, 466 U.S. at 687). The Kentucky Supreme Court denied this claim, *Bowling*, 80 S.W.3d at 413, so the "doubly deferential" standard of § 2254(d) applies, *Pinholster*, 131 S. Ct. at 1403.

Under any standard, however, Bowling's claim stumbles before it gets out of the starting gate. His lawyer *did* object to evidence of the Rockcastle shooting, several times. Even assuming, for the sake of argument, that the shooting was inadmissible, Bowling's lawyer did everything he could keep it out of evidence. Before trial, he filed a motion in limine to exclude the shooting. *See* 4 T.R. 544-48. And during trial, when the prosecution introduced testimony about the shooting, Bowling's lawyer objected. 18 T.E. 2753. He explained that his objection was on the same grounds as the motion in limine, and that he wanted the objection to continue "so I don't have to keep objecting to everything." *Id*. The trial court noted a continuing objection but allowed the testimony. *Id*. After losing that battle, Bowling's lawyer tried to limit the damage to his client. He asked the trial court to admonish the jurors that they should "not consider any alleged acts, of any alleged criminal activity, as to Rockcastle County, as evidence of guilt as to the charges here in Laurel County," and the judge delivered that admonition. 19 T.E. 2808-10. Finally, in the penalty phase, Bowling's attorney renewed his objection to evidence of the Rockcastle shooting and

asked the court to admonish the jury again not to consider the shooting as evidence of guilt. 24 T.E. 3634-36.

When evaluating whether a lawyer performed deficiently, courts "strongly" presume that defense lawyers "have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Bowling's lawyer repeatedly objected to evidence of the Rockcastle County shooting, and he expressly asked the trial court to note his objection as "continuing." 18 T.E. 2753. At best, standing up at closing to object again would have been a Sisyphean attempt to push the Rockcastle boulder up a steep hill. At worst, that boulder might have rolled back down to damage the credibility of Bowling's lawyer with the jury. Bowling might wish that his lawyer's arguments had succeeded, but his counsel was not ineffective simply because he did not prevail. *See, e.g.*, *Baze v. Parker*, 371 F.3d 310, 320-21 (6th Cir. 2004) (pointing out that an attorney "merely losing, being wrong, or miscalculating is not enough to free every person convicted of a crime") (quoting *McQueen v. Scroggy*, 99 F.3d 1302, 1315 (6th Cir. 1996)). As a result, Bowling cannot show that his lawyer's performance was deficient, and he is not entitled to relief on this claim.

## XI.    Ex Parte Hearing on Expert Funding (Claim 56)

Bowling wanted funds to hire a neuropsychologist to assist him in the penalty phase. He asked the trial court to conduct an *ex parte* hearing so he could request funds for an expert. The trial court had previously stated that it would hold any hearings on defense requests for experts *ex parte*. 2 T.R. 285. In this instance, the trial court denied Bowling's request for an *ex parte* hearing, but it ordered Bowling to receive a psychological examination. Nevertheless, Bowling claims the trial court erred by denying his request for

an *ex parte* hearing.  The Kentucky Supreme Court subsequently affirmed that ruling, *see Bowling*, 80 S.W.3d at 422-23, so the § 2254(d) standard of review applies to this claim.

Bowling may have lost the battle over the motion for an *ex parte* hearing, but he won the war over expert assistance.  Although the trial court denied Bowling's motion for an *ex parte* hearing, it ordered the Kentucky Correctional Psychiatric Center to "designate a psychiatrist and/or psychologist to serve as an expert witness" for Bowling.  *Id.* at 423.  That expert was to "examine" Bowling "thoroughly" and "devote particular attention to the organic head trauma suffered by" Bowling and its effect on his behavior.  *Id.*  The trial court also ordered the expert to "provide an accurate assessment" of Bowling's intelligence, prepare "an accurate multi-axial diagnosis" of Bowling's psyche, and use "all good faith efforts to discover all things relevant to the presentation of a mitigation case" by Bowling.  *Id.*  Moreover, the trial court ordered that this analysis be provided only to Bowling's lawyers, "not to . . . the prosecuting authorities of the Commonwealth in any manner in this case" or in any other case involving Bowling.  *Id.*  Thus, although Bowling did not receive an *ex parte* hearing to request funds for an expert, he received the ultimate objective of his request—independent and confidential expert psychological analysis that he could use as mitigation evidence.

But Bowling still argues that he suffered constitutional harm.  The failure to provide him an *ex parte* hearing, he says, allowed the prosecution to learn "not only what type of expert [he] sought (mental health), but the expert's intended use (the penalty phase)."  R. 1 at 275.  He further argues that the Kentucky Supreme Court unreasonably applied *Ake v. Oklahoma*, 470 U.S. 68, 82 (1985), when it denied this claim.  *See* R. 1 at 274; R. 159 at 263-65.

As a first matter, *Ake* does not extend as far as Bowling would like.  Under § 2254(d)(1), a state court's decision is an "unreasonable application" of federal law if the state court "identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case," or if the state court "unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context."  *Lowe v. Swanson*, 663 F.3d 258, 261 (6th Cir. 2011) (quoting *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008)).  *Ake* only guarantees a defendant the right to a psychiatrist in two situations: when the defendant's sanity is a significant factor at trial, and, in the context of a capital sentencing proceeding, "when the State presents psychiatric evidence of the defendant's future dangerousness."  470 U.S. at 83.  Its holding "does not mandate the appointment of a general mitigation expert or investigator for the penalty phase" because "case law places the burden of the mitigation investigation largely on the attorneys themselves."  *Wogenstahl v. Mitchell*, 668 F.3d 307, 340 (6th Cir. 2012) (citing *Fauntenberry v. Mitchell*, 515 F.3d 614, 645-46 (6th Cir. 2005)); *see also Kordenbock*, 919 F.2d at 1120 (holding that a defendant in a capital case was not entitled to a state-funded psychiatrist under *Ake* because the state did not present psychiatric evidence).  Here, Bowling did not place his sanity at issue in the guilt phase, and the Commonwealth presented no psychiatric evidence in the penalty phase. As a result, *Ake* did not require the Kentucky courts to appoint any expert assistance for Bowling.

Nevertheless, the trial court chose to exceed *Ake*'s minimum by appointing an expert for Bowling.  Its decision to do so openly did not violate any of Bowling's constitutional rights. Unsurprisingly, Bowling cites no law—let alone decisions from the Supreme Court— to support his argument for a constitutional right to an *ex parte* hearing on expert funds.  To

the contrary, *Ake* held that a defendant does not have the constitutional right to "choose a psychiatrist of his personal liking or to receive funds to hire his own." *Ake*, 470 U.S. at 83. Rather, he must only have access to a "competent" psychiatrist. *Id*. And a "competent" expert is not necessarily an independent one. *See Smith*, 348 F.3d at 208 & n.10 (explaining that *Ake* does not mandate that defendants receive an "independent" psychiatrist, only a "competent" one).

As the Court explained in Claim 8, some constitutional rights are predicated on the existence of another. *See supra* p. 23 (explaining that, for example, a litigant cannot claim ineffective assistance of counsel in a civil case because there is no right to counsel in civil cases). If a defendant does not have the right to an independent psychiatrist, he can hardly have the right to a confidential one. *See Powell*, 332 F.3d at 392 (predicating a defendant's right to an independent psychiatric expert on his due-process right to a psychiatric expert). Again, the trial court exceeded *Ake* by not only granting Bowling an expert, but ordering that expert to send his reports only to Bowling. *Bowling*, 80 S.W.3d at 423. As a result, Bowling did not suffer a deprivation of any constitutional rights, and the Kentucky Supreme Court's decision was not an unreasonable application of *Ake*. Bowling cannot succeed on this claim.

## XII.    Trial Judge Bias (Claim 68)

Bowling alleges that his trial judge, Judge Hopper, was biased for two reasons. First, he claims that Judge Hopper ate lunch with the prosecutor during trial. R. 1 at 308-09. At the postconviction hearing nine years after the trial, two of Bowling's uncles testified that they saw Judge Hopper and the prosecutor together at a table in the local restaurant where the jury was having lunch. Rule 11.42 Hr'g Video, Disc 3, 17:53:00-18:23:32. One uncle said that the judge and the prosecutor were on opposite ends of an eight-person table, while the

other said that to the best of his knowledge the two were sitting at the same "smaller" table. *Id.* Neither could tell, however, whether Hopper and the prosecutor discussed the case. *Id.* Second, Bowling believes that Judge Hopper should not have also presided over his state postconviction hearing because Hopper had a personal interest in upholding his own trial rulings. R. 159 at 285. Bowling argues that these improprieties deprived him of due process and the right to a fair trial.

Before reaching the merits of these arguments, the Court must first determine whether Bowling properly raised them before the Kentucky courts. A federal court can only consider habeas claims that a petitioner fairly presented to the state courts. *Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009). If a petitioner has not fairly presented his claims and the state courts no longer can rule on them, those claims are procedurally defaulted. *Id.* "Fairly presenting" a claim requires more than just mentioning it in passing. Rather, a petitioner must present both the factual and legal basis for his claims to the state court. *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)). Even if there were "variations in the legal theory or factual allegations urged in [the claim's] support," the petitioner must have presented state courts with a claim similar enough "that the ultimate question would have been the same." *Jells v. Mitchell*, 538 F.3d 478, 504 (6th Cir. 2008). Neither a "somewhat similar state-law claim," *Anderson v. Harless*, 459 U.S. 4, 6, (1982), nor a general allegation of a fair trial or due-process violation is enough, *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).

Procedural default is an affirmative defense, *Gray v. Netherland*, 518 U.S. 152, 165 (1996), and the Warden has not raised it here. But even if the state has not asserted procedural default, a federal court may nonetheless consider it *sua sponte*. *See Sowell v.*

*Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004) (quoting *Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000)); *see also Day v. McDonough*, 547 U.S. 198, 209 (2006) (holding that district courts "are permitted, but not obliged to consider, *sua sponte*, the timeliness of a state prisoner's habeas petition" and that it makes "scant sense" to distinguish timeliness from procedural default).  Raising procedural default *sua sponte* can serve the interests of comity between the federal and state judicial systems, especially when—as is the case here—a petitioner changes the thrust of his arguments between his state-court appeal and his federal habeas petition.  *See Hardiman v. Reynolds*, 971 F.2d 500, 503 (10th Cir. 1992) (discussing the comity interests that federal courts advance by invoking the procedural default doctrine).

Of course, a court should not raise an issue on its own initiative without giving the parties notice and opportunity to be heard.  *See Day*, 547 U.S. at 210.  Here, the Court ordered the parties to provide supplemental briefing on several issues, including procedural default.  R. 190 at 2.  Admittedly, that Order did not provide the parties with an issue-by-issue notification of potential procedural defaults, but *Day* does not require any such roadmap.  Even if it did, the Court would be under no obligation to order additional briefing because Bowling's procedural default "is manifest in the record and there is nothing further that the parties could bring" to the Court's attention.  *Elzy*, 205 F.3d at 887.  As a result, the Court will consider whether Bowling's new arguments on this claim are procedurally defaulted.

Bowling did not fairly present his claims of trial-court bias to the Kentucky Supreme Court.  In his motion for postconviction relief, Bowling raised Judge Hopper's lunch with the prosecutor as a claim of error.  1 T.R. for Rule 11.42 Appeal 195-96.  And in his reply brief, he argues that Hopper had a personal interest in upholding his own trial rulings.  R. 159 at

286-87. Yet on appeal to the Kentucky Supreme Court, Bowling made only one argument, different from his other two: that Judge Hopper should have recused himself from the postconviction hearing because Hopper was a material witness at that hearing. *See* Appellant's Br. at 42, *Bowling v. Commonwealth*, 80 S.W.3d 405 (Ky. 2002) (No. 98-SC-759), App'x of App. R. 451, 502. Unsurprisingly, the Kentucky Supreme Court did not address the two issues that Bowling did not mention in his brief. Instead, it ruled on the one argument that Bowling did raise. *See Bowling*, 80 S.W.3d at 419 ("Bowling argues that the trial judge was a material witness at the hearing. . . . Our review of the record does not show that the questions asked of witnesses or the extent of questioning by the trial judge was an abuse of discretion.").

These three arguments all related to Bowling's rights to due process and a fair trial, but they involved substantially different questions. His lunch argument requires a court to determine a judge's permissible *ex parte* contacts with the parties during a criminal trial; his personal interest argument asks whether a judge may reconsider his own rulings on collateral review; and his witness argument tests the limits of a judge's authority to elicit testimony. These three arguments are not similar enough that their "ultimate question[s] would have been the same." *Jells*, 538 F.3d at 504. Furthermore, Bowling can no longer raise the two arguments he abandoned in his state-court appeal. *See Osborne v. Payne*, 31 S.W.3d 911, 916 (Ky. 2000) ("Any part of a judgment appealed from that is not briefed is affirmed as being confessed."); *Cosby v. Commonwealth*, 776 S.W.2d 367, 369 (Ky. 1989) (noting that rules for presenting arguments on appeal still apply in a capital case), *overruled on other grounds by St. Clair v. Roark*, 10 S.W.3d 482, 487 (Ky. 1999). As a result, these arguments are procedurally defaulted.

Admittedly, Bowling did mention the trial judge's lunch habits in his appellate brief. In a footnote, he pointed out that "the 'appearance of evil' principle may have been violated because two witnesses testified that they had seen the judge and the prosecutor eating lunch at the same table in a restaurant in the presence of the jurors."  Appellant's Br. at 42, *Bowling v. Commonwealth*, 80 S.W.3d 405 (Ky. 2002) (No. 98-SC-759), App'x of App. R. 451, 502 n.45.  But this footnote was an element of Bowling's argument that the "the court relied upon its own statements in determining the issues" and "questioned several witnesses at length during the 11.42 hearing."  *Id*. at 502-03.  As Bowling pointed out, the trial judge stated in his questions at the postconviction hearing that "there [were] only two sit-down restaurants in downtown London" at the time of the trial, and that it was the judge's policy "not to sit at the same table in any restaurant with the Commonwealth."  *Id*. at 502 n.45 (quoting 6 T.R. for Rule 11.42 Appeal 773).  That statement bolstered Bowling's argument that the judge gave "official approval to the prosecution's side" by providing "evidence through its own questions to the witnesses."  *Id*. at 503.  And beyond stating that "the actions of the judge and prosecutor 'didn't quite look up to par,'" Bowling did not make any legal argument on the issue of *ex parte* contact.  *Id*. at 503 n.45; *cf. Jack Henry & Assocs., Inc. v. BSC, Inc.*, Nos. 10-6258, 10-6507, slip op. at 6 (6th Cir. June 25, 2012) (per curiam) ("There is a difference between merely using words from a law and actually making arguments that reference and rely on that law and case law").  As a result, Bowling procedurally defaulted on this argument by failing to present it fairly to the Kentucky courts.

But even if Bowling's claims were not procedurally defaulted, he would not prevail on them.  For good reason, courts disfavor *ex parte* contact between judges and prosecutors.  *See, e.g.*, *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968).  But

not every communication between a judge and a prosecutor is a constitutional violation. "[T]he floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal, before a judge with no *actual* bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (emphasis added) (citation and quotation marks omitted). Under that standard, "[o]nly in the most extreme of cases would disqualification on the basis of bias and prejudice be constitutionally required." *Williams v. Anderson*, 460 F.3d 789, 814 (6th Cir. 2006) (brackets omitted) (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986)). Furthermore, "*ex parte* contact does not, in itself" create "evidence [of] any kind of bias." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002). Here, the only evidence Bowling has presented—testimony from two of his relatives—is not enough to suggest actual bias. Bowling has not identified any rulings by Judge Hopper that were infected by bias. He has also not presented evidence that Judge Hopper discussed Bowling's case with the prosecutor. Instead, his only argument is that the judge created the appearance of impropriety with his lunch-hour behavior. Standing alone, that appearance is not enough to establish a due-process violation.

Bowling's argument that the trial judge had an interest in the outcome of the postconviction hearing is also unavailing. Certainly, the time-honored maxim that "[n]o man is allowed to be a judge in his own cause" remains true today. The Federalist No. 10, at 56 (James Madison) (Jacob E. Cooke ed., 1982). But that principle requires only a judge to recuse himself when he has "a direct, personal, substantial, *pecuniary* interest" in a case. *Turney v. Ohio*, 273 U.S. 510, 523 (1927) (emphasis added). Nonfinancial interests only violate due process when a judge acts as a "one-man grand jury," that is, when a judge

accuses the defendant of criminal conduct and then also presides over his trial.  *In re Murchison*, 349 U.S. 133, 136-37 (1955).

By contrast, federal and state judges routinely reconsider their previous rulings as part of the error-correction process.  A few examples illustrate this point.  Federal prisoners must file their motions for relief under § 2255 in the court that imposed their sentence, 28 U.S.C. § 2255(a), and the Federal Rules of Civil Procedure expressly contemplate that a trial court will hear a motion to alter its own final judgment.  *See* Fed. R. Civ. P. 60(b).  And if Bowling's remaining habeas claims are not successful, he will presumably ask this Court to issue a certificate of appealability for its own decision.  *See* Rule 11(a) Governing Section 2254 Cases ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").  Nothing was improper about Bowling's trial judge also presiding over his postconviction hearing.  Consequently, Bowling did not suffer any constitutional harm.  He is not entitled to relief on this claim.

## XIII.  Comparative Bullet Lead Analysis (CBLA) Evidence (1st Amend. to Petition)

One of the witnesses at Bowling's trial was Donald Havekost, an FBI forensic scientist.  Havekost performed a chemical analysis of the bullets found at the three gas stations and compared them to the bullets the police found in an ammunition box in Bowling's trailer.  21 T.E. 3098-3128.  That technique is known as Comparative Bullet Lead Analysis, or CBLA.[7]

In the United States, lead from recycled car batteries is the primary source of metal for bullets.  *See* National Research Council of the National Academies of Sciences, <u>Forensic</u>

---

[7] The technique is also sometimes called Compositional Analysis of Bullet Lead, or CABL.

Analysis: Weighing Bullet Lead Evidence (2004), 6 Rule 60.02 Appeal Tr. 121, 170 [hereinafter Weighing Bullet Lead].  Bullet manufacturers melt the lead in large vats, adding antimony to harden the mixture.  *Id.* at 172.  But lead is not the only metal in car batteries—small amounts of other elements, including arsenic, bismuth, copper, silver, and tin, are absorbed into the molten mixture.  *Id.* at 172-73.  After melting, manufacturers pour the mixture into ingots, and those ingots are molded and cut into bullets.  *Id.* at 171.  But different batches contain slightly different amounts of trace metals.  By analyzing the chemical composition of several bullets, a forensic scientist can determine whether they came from the same batch of lead.

In Bowling's case, Havekost tested thirty-nine bullets and fragments from the bodies of Smith and Hensley, the Rockcastle County Sunoco, and a box of ammunition police found in Bowling's trailer.  1 T.R. 41.  He found that thirty-six of the bullets were made by the same manufacturer, Winchester, while three were not.  21 T.E. 3103.  These thirty-nine bullets contained seven distinct chemical compositions, which Havekost labeled groups A through G.  1 T.R. 42.  Groups A and B each contained one bullet from the body of Smith; Group C contained one bullet from the body of Smith and one from the body of Hensley; Group D contained three bullets from Hensley, three bullets from the Rockcastle Sunoco station, and sixteen bullets from the box in Bowling's trailer; Group E contained two bullets from Hensley, one from the Rockcastle Sunoco, and three from Bowling's trailer; Group F contained one bullet from the Rockcastle Sunoco and five from Bowling's trailer; and Group G contained one bullet from the Rockcastle Sunoco.  *Id.* at 41-42; *see also* R. 1 at 250 (tables showing bullet groups).  Havekost further testified that the FBI maintained a historical database of CBLA results, and these groups were different from any other bullets in the

database. 21 T.E. 3121. He also told the jury that in his experience, two bullets shared the same chemical composition only when they were used in "related" crimes. *Id.* at 3111.

As it later turned out, however, CBLA was not all it was cracked up to be. Subsequent research showed that bullets from different batches of lead sometimes have the same chemical composition. Amend. to Pet., R. 81 at 10. As a result, two bullets that come from different boxes of ammunition might share the same chemical characteristics, making them indistinguishable through CBLA. Weighing Bullet Lead, *supra*, at 137. Based on this new research, Bowling filed a motion for a new trial in January 2005, alleging (among other things) that Havekost's testimony was so unreliable as to render his trial fundamentally unfair. 1 Rule 60.02 Appeal Tr. 6–23. The Laurel Circuit Court denied that motion, and Bowling appealed to the Kentucky Supreme Court. That court affirmed, holding that Bowling did not "present a sufficiently compelling argument that Havekost's testimony affected the judgment of the jury under the evidence as a whole." *Bowling*, 2008 WL 4291670, at *3. As a result, the § 2254(d) standard of review applies to this claim.

For Bowling to succeed on this due-process claim, it is not enough that Havekost's CBLA evidence was of low probative value or questionable reliability. Because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," *Estelle*, 502 U.S. at 68, an evidentiary claim is only cognizable in habeas if the state court's ruling was "so fundamentally unfair" as to violate the defendant's due-process rights, *Henness*, 644 F.3d at 326 (citing *Bey*, 500 F.3d at 519-20). And "[w]hether the admission of prejudicial evidence constitutes a denial of fundamental fairness turns upon 'whether the evidence is material in the sense of a crucial, critical highly significant factor.'"

*Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000) (quoting *Leverett v. Spears*, 877 F.2d 921, 925 (11th Cir. 1989)).

When it affirmed the lower court's denial of Bowling's motion for a new trial, the Kentucky Supreme Court did not cite any federal law.  Instead, that court relied on *Commonwealth v. Spaulding*, 991 S.W.2d 651, 657 (Ky. 1999), which held that unreliable testimony only violates due process when a defendant could establish a "reasonable likelihood that the false testimony could have affected the judgment of the jury under the evidence as a whole," *id.* at 657 n.1.  That standard might not have been identical to the federal constitutional standard, but state courts need not cite any Supreme Court cases or even display an awareness of them, "so long as neither the reasoning nor the result of the state-court decision contradicts" Supreme Court precedent.  *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  As a result, the only relevant question on habeas review is whether the Kentucky Supreme Court's decision was contrary to clearly established federal law.

And although the Kentucky Supreme Court may not have identified the correct standard, its ruling reached the same outcome as federal precedent on fundamental fairness.  As a first matter, the U.S. Supreme Court has never held that CBLA evidence renders a defendant's trial fundamentally unfair.  In fact, one court of appeals has expressly held that CBLA testimony is not so flawed as to violate due process.  *United States v. Berry*, 624 F.3d 1031, 1040-42 (9th Cir. 2010) (rejecting a § 2255 motion based on CBLA evidence because scientific studies did not "establish that [CBLA] evidence is so fundamentally unreliable that its introduction at trial violated [the defendant's] due process rights"); *see also United States v. Higgs*, 663 F.3d 726, 742 (4th Cir. 2010) (holding that CBLA evidence did not prejudice a defendant because the analysis "merely corroborated" the "overwhelming evidence" of the

defendant's guilt); *In re Berkley*, 375 F. App'x 413, 415 (5th Cir. 2010) (denying a prisoner's request to file a successive habeas petition based on CBLA claims because the prisoner failed to show that "but for the flawed bullet analysis, no reasonable fact-finder would have found him guilty of capital murder").

Even without on-point U.S. Supreme Court precedent, Havekost's testimony did not make Bowling's trial fundamentally unfair for three reasons.  First, although CBLA testimony may no longer be admissible in Kentucky courts, *see Ragland v. Commonwealth*, 191 S.W.3d 569, 582 (Ky. 2006), the analysis still has some probative value.  Bowling leans heavily on the 2004 National Research Council report to criticize Havekost's testimony.  *See, e.g.*, R. 81 at 10; R. 159 at 289.  But that report also stated that CBLA is "a reasonably accurate way of determining whether two bullets could have come from the same compositionally indistinguishable volume of lead."  Weighing Bullet Lead, *supra*, at 137. Havekost's testimony did exactly that: he linked bullets that came from chemically identical batches of lead, but he did not definitively state that all of the bullets came from the same box.

Second, as the Kentucky Supreme Court noted, the CBLA evidence was "corroborative" of other evidence linking Bowling to the crime.  *Bowling*, 2008 WL 4291670, at *2; *see also* Weighing Bullet Lead, *supra*, at 137 (stating that CBLA is "appropriate" to "provide additional evidence that ties a suspect to a crime").  Several other pieces of circumstantial evidence tied Bowling to the bullets: traditional "lands and grooves" ballistics tests linked the bullets that killed Smith to the bullets that killed Hensley and the bullets fired in the Rockcastle County shooting, *see* R. 1at 20-21; Ricky Smith and Ora Lee Isaacs identified the revolver found along the side of the highway after the Rockcastle

County shooting as belonging to Bowling; and the brown gloves Bowling threw out of his car during the police chase contained lead residue.  *See Bowling*, 2008 WL 4291670, at *2. In his amended petition, Bowling offers alternate theories for why these pieces of circumstantial evidence were not enough to support a guilty verdict.  *See* R. 81 at 24-25. Alternate theories, however, are not enough to show that the Kentucky Supreme Court's conclusion was objectively unreasonable.  *See, e.g.*, *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (explaining that a state court's decision need only be "minimally consistent with the facts and circumstances of the case" or "one of several equally plausible outcomes (quoting *Hennon*, 109 F.3d at 335; *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997))); *see also id*. (noting that a habeas petitioner "faces a nearly insurmountable hurdle" when challenging sufficiency of the evidence underlying his conviction (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).  By extension, because CBLA was just one "stone in a foundation [of evidence] strong enough to stand without it," *Bowling*, 2008 WL 4291670, at *2, the flawed evidence was not a "crucial, critical" factor that could render Bowling's trial fundamentally unfair, *O'Dea*, 227 F.3d at 645.

Third, Havekost's testimony avoided some of the most dangerous pitfalls of CBLA evidence.  He told the jury that each batch of lead produced by Winchester yields approximately 50,000 bullets, 21 T.E. 3104, and that CBLA could not distinguish between bullets from within the same batch, *id*. at 3105-06.  That statement fell within the National Research Council's conclusion that batches of lead vary in size from 12,000 to 35 million bullets and that bullets from within a batch are "compositionally indistinguishable." Weighing Bullet Lead, *supra*, at 187.  Havekost also did not directly claim that CBLA proved the bullets used to murder Smith and Hensley came from the same box as Bowling's

ammunition.  Instead, he told the jury that each group of bullets came from the same batch of lead, and that he had never found the same batch to produce two bullets used in unrelated crimes.  21 T.E. at 3111.  That statement may have misled the jury, but it was accurate testimony based on his own personal experience as a forensic examiner.  And on cross-examination, Bowling's lawyer challenged Havekost's conclusions.  *Cf. Barefoot v. Estelle*, 463 U.S. 880, 901 (1983) (allowing a capital sentencing jury to consider potentially unreliable psychological evidence unless "the adversary process cannot be trusted to sort out the reliable from the unreliable").  He emphasized that Havekost could not match the crime scene bullets to any other bullets in the FBI database, *id*. at 3125-26, and that two of the bullets from Smith's body had no matches at all, *id*. at 3126.

Havekost also made relatively few overstatements compared to CBLA experts criticized by the National Research Council.  In other cases, experts claimed that two bullets with the same chemical composition "came from the same box of ammunition," Weighing Bullet Lead, *supra*, at 180 (quoting *State v. Earhart*, 823 S.W.2d 607 (Tex. Crim. App. 1991)), were made by the same manufacturer on the same day and at the same hour, *id*. (quoting *Brown v. State*, 601 P.2d 221, 224 (Alaska 1979)), or were produced "at the same time, using the same lead source," *id*. (quoting *People v. Villarta*, No. H021354, 2002 WL 66887, at *6 (Cal. Ct. App. Jan. 17, 2002)).  Havekost made none of those claims.  Instead, he informed the jury that bullets with the same chemical composition were likely to have come from the same batch of lead, and let the jurors draw their own inferences about whether the bullets that killed Smith and Hensley came from Bowling's ammunition box.  *Cf. id*. at 185 (concluding that inferences about whether a crime scene bullet came from the defendant's box of ammunition are "a matter for the jury").

For his part, Bowling argues that the Kentucky Supreme Court's holding was contrary to *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *See* Amend. to Pet., R. 81 at 24-25.  But this argument confuses the standard for a due-process violation with the harmless-error doctrine.  *Brecht* held that a constitutional error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 622 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  Obviously, that analysis is premised on the existence of a constitutional error.  Although the CBLA testimony may have been inadmissible, it did not create constitutional error.  *See Perry*, 132 S. Ct. at 728 (emphasizing that "the potential unreliability of a type of evidence does not alone render its introduction at the defendant's trial fundamentally unfair" and that general due-process claims should be discouraged where there are "safeguards built into our adversary system that caution juries").  Rather, whether there was a constitutional error depends on whether the CBLA testimony rendered Bowling's trial fundamentally unfair.  And as the Court has already explained, it did not.  As a result, *Brecht* was not the relevant federal law.

In short, Havekost's testimony was not so prejudicial as to deprive Bowling of due process.  Based on recent research, Kentucky courts might not admit CBLA evidence today.  *See Ragland*, 191 S.W.3d at 582.  But Havekost avoided egregious overstatements, and the Kentucky Supreme Court held that even without the CBLA testimony, enough other evidence linked Bowling to the murders of Smith and Hensley.   Bowling's focus on harmless-error analysis is misplaced: the proper question is whether the Kentucky Supreme Court acted contrary to clearly established federal law.   Under the relevant federal law, Bowling only suffered a due-process violation if the CBLA testimony made his trial fundamentally unfair.  He has not shown that it did.  On the contrary, the CBLA testimony

was one brick in the wall of evidence against Bowling, not the kind of "crucial, critical" evidence that could make a trial fundamentally unfair.  *See O'Dea*, 227 F.3d at 645. Consequently, Bowling was not deprived of due process and he is not entitled to relief on this claim.

## XIV.  Cumulative Error (Claim 44)

Even if no individual claim is sufficient to grant habeas relief, Bowling argues that the cumulative effect of all of the alleged errors in his trial denied him due process.  The Kentucky Supreme Court rejected this claim on direct appeal, *see Bowling*, 942 S.W.2d at 308, so the § 2254(d) standard of review applies.

This claim fails for a simple reason: no clearly established federal law stands for the proposition that individual harmless errors can amount to a due-process violation when considered in combination.  *See Williams*, 460 F.3d at 816 ("[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) (holding that a state court's denial of a cumulative error claim could not be contrary to clearly established federal law because "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief").  Bowling is thus not entitled to relief on this claim.

## CONCLUSION

Accordingly, it is **ORDERED** that Bowling's petition for the writ of habeas corpus, R. 1, is **DENIED** for Claims 1, 5, 6, 8, 9A, 9B, 9D, 10, 11, 12, 14, 17, 21, 22, 23, 24, 25, 27, 28, 29, 30, 31, 32, 34, 35A, 35B, 35D, 35F, 35H, 36, 39, 44, 49, 56, 65, 68, and the First Amendment to his Petition.   The Court will issue a separate opinion addressing the remainder of Bowling's claims.

This the 26th day of June, 2012.



**Signed By:**

*Amul R. Thapar*

**United States District Judge**